PENN STAR MINING CO. v. LYMAN et al.

No. 4138.   Decided November 19, 1924.   (231 Pac. 107.)

1. EVIDENCE—WRITTEN INSTRUMENT MAY NOT BE VARIED BY EX-
   TRINSIC EVIDENCE, BUT SUCH EVIDENCE IS ADMISSIBLE TO SHOW
   INTENT, IF OBSCURE, UNCERTAIN, OR AMBIGUOUS. Extrinsic evi-
   dence may not be admitted to affect, vary, add to, or modify
   written instrument, but is admissible to show true intention
   of parties, if language of instrument is obscure, uncertain,
   or ambiguous.

2. CONTRACTS—UNLESS PROVISIONS OF CONTRACT ARE INDEPENDENT
   AND SEVERABLE, THEY MUST BE CONSTRUED TOGETHER. Unless
   provisions of contract are clearly independent, distinct, and
   severable, all terms and provisions must be construed to-
   gether.[1]

3. EVIDENCE—WRITTEN INSTRUMENTS PASSING BETWEEN PARTIES TO CONTRACT, BEARING UPON SUBJECT-MATTER OF AMBIGUOUS WRITING, ARE ADMISSIBLE. Written instruments passing between parties to ambiguous written contract, and having bearing on its subject-matter, are under certain circumstances, admissible in evidence to ascertain intention of parties.

4. CONTRACTS—AMBIGUOUS OR UNCERTAIN LANGUAGE IN CONTRACT CONSTRUED MOST STRONGLY AGAINST PARTY USING IT. Where one of parties to contract, or one directly interested in subject-matter thereof, has prepared it, using ambiguous or uncertain language, such language will be construed most strongly against party using it, especially when interested party is lawyer and prepares contract for opposite parties, who are laymen.

5. CONTRACTS—PARTY HELD TO SENSE IN WHICH HE KNEW OR UNDERSTOOD OTHER PARTY UNDERSTOOD AMBIGUOUS LANGUAGE. If language of contract is doubtful, party to it will be held to sense in which he knew or understood other party understood ambiguous language.

6. EVIDENCE—DOCUMENTARY AND ORAL EVIDENCE HELD ADMISSIBLE TO EXPLAIN AMBIGUOUS PROVISIONS OF CONTRACT AS TO PURCHASE OF MINING STOCK AND FRAUD IN MISREPRESENTING CONTRACTS. In action for balance due on stock in mining company, alleged to have been contracted for in writing in connection with contract to develop mining property, contract *held* ambiguous as to personal liability of defendants to buy stock, and documentary and oral evidence, tending to show that no personal liability was intended and tending to show fraud by interested party, in misrepresenting contents, should have been admitted.

7. CONTRACTS—EFFECT OF EVIDENCE FOR TRIAL COURT OR FOR JURY. Effect of evidence offered to explain meaning of ambiguous provisions of contract is primarily for trial court, and, in case of dispute or conflict concerning facts, for jury.

8. CONTRACTS—COURT TO DETERMINE LEGAL EFFECT OF CONTRACT. Though facts concerning contract and construction thereof are in dispute, and are submitted to jury when they are found, court must determine legal effect of contract.

Appeal from District Court, Third District, Salt Lake County; *Ephraim Hanson*, Judge.

Action by the Penn Star Mining Company against R. Lyman and another. From a judgment for plaintiff against defendant Lyman, he appeals.

REVERSED and REMANDED with directions.

*George M. Sullivan,* of Salt Lake City, for appellant.

*Bagley, Judd & Ray,* of Salt Lake City, for respondent.

---

1 *Caine* v. *Hagenbarth,* 37 Utah, 69, 106 P. 949.

See (1) 22 C. J. pp. 1098, 1173, 1175 (2) 13 C. J. pp. 525, 527 (3) 22 C. J. p. 1183 (4, 5) 13 C. J. p. 545 (6) 22 C. J. pp. 1173, 1183, 1215 (7) 13 C. J. p. 785 (8) 13 C. J. p. 786.

FRICK, J.

The plaintiff, a Nevada corporation, commenced this action in the district court of Salt Lake county against the defendants to recover an alleged balance of $7,200, which plaintiff alleged was owing from the defendants for 50,000 shares of mining stock, which it is alleged the defendants had agreed to purchase and pay for in connection with a certain lease of certain mining properties located in Nevada. The contract sued on, to which we shall more specifically refer hereinafter, is made a part of the complaint. The defendant Crampton was not served with process, and has never appeared in the action. The defendant Lyman appeared and answered plaintiff's complaint.

The answer is very voluminous. It contains many denials and explanations, setting forth in detail the whole transactions between the parties; denies that it was intended that the defendants should assume, or did assume, any personal liability, by virtue of the contract sued upon, to purchase any particular number, or any number, of shares of said mining company stock, and that such was the agreement between the parties; and alleges that, if it be held that the contract sued on obligated the defendants to purchase and pay for said 50,000 shares of the mining stock, such

provision was inserted in such contract by the deception and misrepresentations practiced by one P. W. Spaulding, who was an attorney at law, and was president of the corporation; alleges that, by reason of particular circumstances and representations, all of which are fully set forth in the answer, the defendants were induced to sign said contract without carefully examining the same, and without obtaining the advice of counsel, etc.

We can do no more than to give a mere outline of the averments contained in the answer. In view, however, that it is urgently insisted by the defendants that the contract is ambiguous and uncertain in its terms, we shall set forth so much of the contract as we deem necessary to a full understanding of the questions presented and decided.

The contract provides that both the plaintiff and defendants are desirous of raising a certain amount of money which is to be expended in the development of certain mining properties in Nevada, which properties were held under a lease by the plaintiff company; that, in consideration of the payment by the defendants of $1,000 to the plaintiff, the defendants are given possession of said mining properties for the purpose of developing the same in accordance with the terms stated in the contract; that the plaintiff agreed to deposit in escrow at a designated office in New York City, 250,000 shares of 1,000,000 shares of the capital stock of the plaintiff, with instructions to the registrar of the New York office to deliver to the defendants, or either of them, or to their assigns, "all or any part of said 250,000 shares of stock aforesaid at the rate of fifteen (15) cents per share"; that any part or all of said 250,000 shares of stock should be delivered to the defendants or their assigns, upon the presentation by them to said registrar of proper vouchers to the effect that the money for which the stock was to be delivered had been expended in the development of said mining property; that "the Security Transfer & Registrar Company shall deliver 50,000 shares of said 250,000 shares of stock aforesaid to said operators, or either of them, their order or assigns, as aforesaid, only upon the payment to it

in money at the rate of 15 cents per share for any portion or all of said 50,000 shares of stock, which said payments it shall, when and as received, immediately forward to said the First National Bank of Evanston, Wyoming, for the account of the said mining company.''

The other provisions agreed to be performed by the plaintiff are not of controlling importance, and for that reason we omit them.

The contract then provides that, in consideration of the premises, the defendants agree as follows: To forthwith complete the annual representation or assessment work on all unpatented mining claims which were a part of said mining properties, and to make and record the proof of such work. In view that there is a sharp conflict between the parties respecting the precise meaning of several of the remaining provisions of the contract, we herein insert those provisions at length as follows:

"To purchase or cause the purchase of the 50,000 shares of stock of said mining company, mentioned in paragraph 2c above, in minimum amounts as follows: (a) To purchase or cause to be purchased said stock at not less than the rate aforesaid, and to pay from said purchases as aforesaid not less than $2,000 on or before August 1, 1923, and the further sum of not less than $1,000 on or before September 1, 1923, and the further sum of not less than $3,000 on or before October 1, 1923, and the further sum of not less than $1,200 on or before January 1, 1924; all of the payments mentioned in this paragraph being payable to the said the First National Bank of Evanston, Wyoming, for the account of said mining company, and the remaining $300 of the proceeds of said 50,000 shares at the rate aforesaid being applicable for the present annual assessment work on said property.

"To hold the said mining company free and harmless from all loss, costs, or liabilities due to, or by reason of, the failure of the operators to pay any indebtedness incurred by them in any of the operations aforesaid under this agreement, in the purchase of labor, materials, supplies, equipment, machinery, or for any other purpose, and that they will at all times carry such industrial insurance for the protection of laborers and other employés engaged in the operations aforesaid, as is provided for or required by the laws of the state of Nevada.

"The said mining company agrees that the said operators may, if they deem it necessary or advisable, assign this agreement and

all their rights hereunder to United Imperial Mines Company, a Nevada corporation, upon five days' prior notice thereof by them to said Penn Star Mining Company, by registered letter, addressed to said mining company care P. W. Spaulding, Evanston, Wyoming.

"Provided, however, in the event of the neglect, failure, or refusal of said operators to do or perform any of the things or acts to be by them done or performed under this agreement, promptly, fully, and completely when the same ought to be done and performed, the said Penn Star Mining Company shall have the right to, without notice to said operators or either of them, terminate and end this agreement, and this agreement shall thereupon terminate and end, and in that event said mining company shall give notice thereof by registered mail to said Security Transfer and Registrar Company of such termination and ending of this agreement, and thereupon said Security Transfer and Registrar shall not issue or deliver any further shares of the stock of said mining company for which it has not theretofore received payment as aforesaid, and thereupon all unissued portion of said 250,000 shares shall be returned to, and remain in the treasury of, said mining company, provided, however, that, in the event of any default occurring on the part of said operators on things to be done or performed after the 15th day of July, 1923, the said mining company shall give said operators or either of them 10 days' notice by registered mail, addressed to their or his usual place of business, to said Lyman, at 857 So. Main street, Salt Lake City, Utah, and if said default shall not be remedied during said 10 days' time the said agreement shall forthwith terminate and end."

The foregoing contract was produced in evidence, and the case was submitted to a jury upon substantially the foregoing issues. The jury returned a verdict in favor of the plaintiff and against the defendant Lyman, upon which judgment was duly entered, from which the defendant Lyman alone appeals.

Many errors are assigned. The principal assignments, however, relate to certain evidence which was proffered on behalf of defendant Lyman, and which, on objection by plaintiff's counsel, was excluded by the court. The evidence was offered in support of defendant Lyman's contention that much of the language of the contract is obscure, uncertain, and ambiguous, and that for that reason the extrinsic evidence offered by the defendant Lyman was proper

and necessary for the purpose of arriving at the true intention of the parties to the contract. Upon the other hand, plaintiff's counsel contend, stating it in their own language, that the contract "is perfectly clear; that it is wholly free from ambiguity; and that the intention of the parties may be gathered at once, upon examination of the instrument, without recourse to strained rules of construction." Counsel, however, after devoting 74 pages of their printed brief to a demonstration of the foregoing statement, finally arrive at the following result, which we again reproduce in their own language:

"Our aim has been to find in the books some specific solvent to which the court might subject Exhibit A, and thereby at once get the correct solution. To this end we have devoted ourselves to the cases and the texts, but contracts, alas, are as varied as the purposes of men, and we confess we have not found just the word we have been looking for."

The principal question determinative of this appeal therefore is: Did the district court err in excluding the evidence proffered on behalf of the defendant Lyman, which was offered for the purpose of aiding the court in arriving at the true intention of the parties to the contract in question?

The district court, it seems, excluded the evidence upon the ground that its effect would be to vary the terms of a written instrument. No doubt the rule is universal and inflexible that extrinsic evidence may not be admitted, if its purpose or effect be to vary or to add to, or to modify in any material respect, the terms of a written instrument. Upon the other hand, the rule is just as extensive and as well established that, in case the language of a written instrument is obscure, uncertain, or ambiguous, so that the intention of the parties is left in doubt by an inspection of the instrument alone, extrinsic evidence, within well-recognized limits, is always admissible to aid the court in arriving at the true intention of the parties. After all, it is the intention of the parties that constitutes their contract, and it is such intention that the courts aim to enforce. Moreover, unless the provisions of a contract are clearly independent, distinct, and severable, all of the terms and

provisions must be considered and construed together, in order to arrive at the intention of the parties. In other words, the contract must be considered and construed as a whole, and such is the case,· "even if the separate parts are clear and free from ambiguity." 2 Page, Contracts, § 2038.

The general rule applicable to contracts, the language of which, is ambiguous or uncertain, is so    2 clearly and comprehensively stated in *Salt Lake City v. Smith*, 104 F. at page 462, 43 C. C. A. 642, that we take the liberty of reproducing the statement in full:

"The purpose of a written contract is to evidence the terms on which the minds of the parties to it met when they made it, and the ascertainment of those terms, and the sense in which the parties to the agreement used them when they agreed to them is the great desideratum and the true end of all contractual interpretation. The express terms of an agreement may not be abrogated, nullified, or modified by parol testimony; but, when their construction or extent is in question, the meaning of the terms upon which the minds of the parties met when they settled them, and their intention in using them, must be ascertained, ·and, when ascertained, they must prevail in the interpretation of the agreement, however broad or narrow the words in which they are expressed. In the discovery of this meaning, the intention, the situation of the parties, the facts and circumstances which surrounded and necessarily influenced them when they made their contract, the reasonableness of the respective claims under it, and, above all, the subject-matter of the agreement and the purpose of its execution, are always conducive to, and often as essential and controlling in, the true interpretation of the contract as the mere words of its various stipulations. These are rules for the construction of contracts which commend themselves to the reason and are established by repeated decisions of the courts, and they must not be permitted to escape attention in the consideration of the contract which this case presents. *Accumulator Co.* v. *Dubuque St. Ry. Co.*, 64 F. 70, 74, 12 C.;C. A. 37, 41, 42, 27 U. S. App. 364, 372."

In *Nebraska Hardware Co.* v. *Humphrey Hardware Co.*, 81 Neb. at page 699, 116 N. W. 661, the Supreme Court of Nebraska adopts and quotes the following pertinent excerpt from 17 A. & E. Ency. L. 21, 23.

"In interpreting a writing, the court, in order to determine its meaning, will consider all the facts and circumstances attending its execution. Among the circumstances so considered are the

relations of the parties, the nature and situation of the subject-matter, and the apparent purpose of making the instrument or contract in question. * * * It is but another statement of the same rule to say, as is frequently done, that the court will, if necessary, put itself in the place of the parties and read the instrument in the light of the circumstances surrounding them at the time it was made and of the objects which they evidently had in view."

The court adds:

"Substantially the same rule has been adopted by this court in *Tootle & Maule* v. *Elgutter*, 14 Neb. 158, and by the Supreme Court of the United States in *Merriam* v. *United States*, 107 U. S. 441, and in *Nash* v. *Towne*, 5 Wall. (U. S.) 689."

We refrain from quoting further from the cases. Among the very numerous cases in which the doctrine referred to in the foregoing excerpts is approved and applied, we cite the following: *O'Brien* v. *Miller*, 168 U. S. 287, 18 S. Ct. 140, 42 L. Ed. 469; *Caine* v. *Hagenbarth*, 37 Utah, 69, 106 P. 949.

Moreover, other written instruments which have a bearing upon the subject-matter of an ambiguous writing which pass between the parties to such contract are, under certain circumstances, admissible in evidence for the       3 purpose of ascertaining the real intention of the parties. See *Clark* v. *Townsend*, 96 Kan. 650, 153 P. 555.

There is still another element to which the courts, under certain circumstances, have recourse, in case the language in a contract is ambiguous or uncertain, which is that, where one of the parties, or one who is directly interested in the subject-matter of the contract, has prepared it and has used language which is ambiguous or uncertain in its meaning, the language will be construed most strongly against the party who has used the ambiguous or uncertain language. The rule is stated in 13 C. J. p. 545, § 516, in the following words:

"Where a contract is ambiguous, it will be construed most strongly against the party preparing it or employing the words concerning which doubt arises; the reason for the rule being that a man is responsible for ambiguities in his own expressions, and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court

will adopt a construction by which they would mean another thing more to his advantage."

Many cases are cited in support of the text. In *Hill* v. *John P. King Mfg. Co.,* 79 Ga. 109, 3 S. E. at page 447, the Supreme Court of Georgia states the rule in the following words:

> "We recognize that the party who wrote the contract, made it ambiguous, and executed it in that condition, must explain the ambiguity, in order to obtain a construction of it in his favor. The author of the ambiguity has the burden of explaining it when he seeks to take the benefit of a construction favorable to himself; and, if he does not clear up the meaning beyond doubt, the doubt must be given against him. Code, § 2757."

While the rule in Georgia has been incorporated into the Code of that state, yet that is not controlling, since the rule is well recognized as a part of the common law.

Although the rule just stated is not one of controlling influence, yet, when the evidence, as in this case, shows that a lawyer, who is an interested party, prepared the contract for the defendants, who are laymen, the rule has special application.

There is still another principal, which is also well established, that, in case the meaning of the language is doubtful, one party to the contract will be held to that sense in which he knew or understood the other party understood the doubtful words or language. *Scully* v. *United States* (D. C.) 197 F. 327; *Spande* v. *Western Life Indemnity Co.,* 68 Or. 171, 136 P. 1189. In the latter case the Supreme Court of Oregon, in referring to the rules of construction of contracts (68 Or. 188) at page 1194 of 136 P. says:

> "Two other rules are applicable: (1) That the language must be interpreted in the sense that the promisor knew, or had reasons to know, the promisee understood it; (2) that the words are to be strongly construed against the party using them"—citing cases.

In the *Scully Case,* supra, the court said:

> "It is a well-established principle that, when there is a doubt as to the meaning [of the words] of a contract, a party will be

held to that meaning which he knew the other party supposed the words to bear"—citing cases.

In view of the foregoing principles, and in the light of what was contained in at least some of the excluded documents and offers of oral evidence, such documents and oral evidencee should have been admitted in evidence.

It is also important to keep in mind that the contract in question here related to undeveloped mining claims whose value was entirely speculative and unknown, and that the purpose of the contract was to develop the property, and by that means to determine, so far as that was possible, its value. The enterprise entered upon by defendants was therefore manifestly speculative and uncertain. The property might be valuable, and it might turn out to be entirely valueless. Under such circumstances, as is well known to all having the slightest experience in metal mining, parties do not, as a rule, bind themselves unconditionally; and that is precisely what the defendant Lyman contends was intended by entering into the contract. A large part of the proffered evidence that was ruled out by the court was offered to clear up that phase of the contract. For example: The defendant Lyman had outlined the terms and conditions of the proposed contract, and had, by means of a letter, written to Mr. Spaulding, the attorney and president of plaintiff, acquainted the latter with those conditions. In that letter, which was offered in evidence and excluded, Mr. Lyman used the following language:

"As a further consideration for our taking over the lease, we undertake to pay you the following amounts: $3,000 on July 1, 1923; $3,000 on October 1, 1923; $1,000 on January 1, 1924. These amounts are understood to be for the taking up of certain indebtedness incurred—excluding a truck now in storage at Ely—and in undertaking to pay said amounts we are to be held free and harmless from any and all claims originating from said indebtedness.

It is specifically agreed that no personal liability shall attach to us by reason of the nonpayment of any of the several amounts of money specified herein, nor for the nonperformance of any of the conditions of this agreement; it being the intention of all parties that such nonpayment or nonperformance shall operate

only as default, and result in the immediate forfeiture only of our rights and interests herein, at your discretion."

That letter was dated April 3, 1923, which was a little more than a month before the contract was formally written by Spaulding and signed by the defendants. To that letter Mr. Spaulding replied by letter, which is dated April 6, 1923, in which Mr. Spaulding said:

"Your letter of the third inst. re Star Mine is at hand on my return this morning from Memmerer, and the same contains a comprehensive statement of the terms we discussed at Salt Lake City last week. * * * In view of the statement in your letter that any agreement reached will not carry personal liability on the part of either of you, I take it that the agreement should be along the lines of an operating contract, and when certain things have been performed, the issuance of stock to cover, and when a stated amount has been issued, the election of your board and the passing of the control. All this we will have to outline at our next meeting and see if we can get our minds together upon it, and I suggest that in the meantime you consider just what should be in such agreement for the protection of both interests."

In connection with the foregoing, there is still another important element of uncertainty in the contract, which is that it is specifically provided therein that the defendants may assign "all their rights hereunder"; that is, under the contract, to a corporation. This is permitted without reserving the right to enforce any of the provisions, including the purchase of 50,000 shares of stock, against the defendants or either of them. That provision, in and of itself, leaves the question of whether the parties intended to create an absolute and unconditional personal liability, as contended by plaintiff, to say the least doubtful. It certainly is not a usual occurrence that a promisee in a contract permits the promisor to assign his personal liability to another without stating the reasons and conditions upon which it may be done, if the promisor is to be held personally liable upon the assigned contract.

Then again, in view of the other evidence which was offered on behalf of Lyman, relating to the attending circumstances and the assurance of Spaulding at and just preceding the time the contract was signed, which was excluded by the court, the language in the foregoing letters is significant

and important. True, counsel for plaintiff objected to the evidence, upon the ground that all prior propositions and negotiations were finally merged into the contract as written, and they now urge that such was the case, and for that reason insist that the ruling of the district court in excluding the evidence was proper. The rule insisted on by counsel is well established, and, in proper cases, should be rigidly enforced. The rule, however, cannot be applied to cases where the language of the contract is doubtful or ambiguous, and where the extrinsic evidence is offered merely for the purpose of aiding the court in arriving at the real intention of the parties by placing before the court all the facts and circumstances under which the contract was executed.

It is, however, also averred in the answer that the defendant Lyman relied on certain declarations and assurances of Spaulding, to the effect that the contract did not impose any absolute personal liability upon the defendants, and that, relying on those assurances and declarations, Lyman signed the contract without a critical examination of its contents, or without obtaining legal counsel with respect to the same. While it is true that such excuses are frequently made for the sole purpose of escaping the consequences of what might develop to be improvident obligations, and hence the courts must exercise great care in applying the rules to which we have heretofore referred, the courts can, however, not arbitrarily refuse to hear proper evidence which is offered merely for the purpose of aiding the court in arriving at the real intention of the parties to a contract whose provisions are ambiguous or doubtful. While it is of the utmost importance that parties should rigidly be held to the terms of their written agreements, yet it is of equal importance that, in case of doubtful provisions, the real intention of the parties (that is, the true meaning of the contract) should be ascertained before it is enforced, and to reach that end the courts have wisely formulated the rules of interpretation hereinbefore referred to. Those rules are wholesome and practicable, and should be applied in all cases where the language is doubtful, and the intention of

the parties cannot be ascertained from a mere inspection of the language used in the contract.

We cannot set forth the contents of the documents nor the other offers of proof which were tendered by the defendant Lyman, without extending this opinion beyond proper limits. It is sufficient to say that, in our judgment, the evidence offered by Lyman's counsel should have been received upon both grounds: (1) Upon the ground that it tended to aid the court in arriving at the true intention of the parties, with respect to whether the defendants were bound unconditionally to purchase and pay for the 50,000 shares of stock; and (2) to determine whether or not Lyman was induced to sign the contract upon the representations and assurances made by Spaulding after he had written out the same.

Lest we be misunderstood, we desire to add in this connection that we are not passing upon nor indicating what effect, if any, the trial court should give to the evidence offered on behalf of Lyman. That is a question which primarily is within the exclusive province of the trial court, or, in case there is a dispute or conflict respecting the facts, for the jury to determine. But, even though the facts are in dispute and are submitted to the jury 7, 8 when they are found, the court must nevertheless determine the legal effect of the contract. We have therefore intentionally refrained from discussing the proffered evidence; nor shall we here attempt a construction of the contract. It is sufficient that, to our minds, there are a number of provisions in the contract which are more or less ambiguous and uncertain, to some of which we have already referred.

There is, however, another provision of the contract which provides that, under certain conditions stated, the contract "shall forthwith terminate and end." We can readily understand that, in case one of the parties to a contract makes default, he should from thenceforth lose all rights under the contract, but it is not so clear to see, in case a contract is terminated and ended, how a party retains the right to

enforce its provisions, or any of them, unless the right to do so is preserved in the contract. Nor is it clear to our minds why a party to a contract should unconditionally bind himself to purchase and pay for 50,000 shares of stock when his rights under the contract may be terminated long before he has been able to demonstrate the value of the stock. That such a contract may be entered into is conceded, but where, as here, the meaning of the contract is doubtful and in dispute, the court should avail itself of every legal and proper aid to arrive at the true intention of the parties before entering judgment.

In this connection we also desire to suggest that in this case much of the excluded evidence consists of writings which were written before any controversy arose, and therefore could not have been colored to meet the occasion. Moreover, such evidence obviates the uncertainties that are incidental to purely oral statements, which, as a rule, are colored to meet the exigencies of the case. Where the proffered evidence, as in this case, is largely in writing, courts should have less hesitancy to receive it, if it affords any aid in solving the doubts which might arise from the uncertain and ambiguous statements contained in a contract. Nor, under such circumstances, is there much danger in admitting the parol testimony as supplementary to the written evidence.

In conclusion we desire to add that the court should also hear the evidence offered in connection with the alleged fraud set forth in the answer. True, the averments respecting fraud are not as specific as they might be, but they are sufficient as against the objections urged upon the trial, and for the purpose of admitting the evidence proffered by the defendant Lyman.

The judgment is therefore reversed, and the cause is remanded to the district court of Salt Lake county, with directions to grant a new trial in accordance with the views herein expressed. Appellant to recover costs.

WEBER, C. J., and GIDEON, and CHERRY, JJ., and WOOLLEY, District Judge, concur.

· THURMAN, J., did not participate herein.