POWELL ET AL. *v.* MADISON SAFE DEPOSIT AND TRUST COMPANY ET AL.

[No. 26,425.   Filed June 14, 1935.]

---

Note 2.   §9-722, Burns, Ind. St. Ann. 1933; §2090, Baldwin's 1934; Acts 1905, ch. 169, §82, p. 584; Acts 1927, ch. 132, §2, p. 411.

*Curtis Marshall, Paul Schnaitter,* and *Charles A. Lowe,* for appellants.

*John McGregor, Tremain & Turner,* and *Donald A. Bear,* for appellees.

FANSLER, J.—Appellants, as plaintiffs, brought this action to secure a construction of certain instruments by which trust estates were created and the Madison Safe Deposit and Trust Company made trustee thereof.

In 1913 William H. Powell died intestate, leaving as his sole surviving heirs his widow, Ella S. Powell, and his two sons, Howard W. Powell and Charles S. Powell. His estate, consisting of real and personal property,

amounted to approximately $150,000. Within a short time after his death the widow and sons, prompted by a desire to preserve and conserve the estate for the benefit of themselves and the wives and children of the sons, agreed to convey their shares to a trustee, which they did accordingly. The widow, Ella S. Powell, immediately executed a will, leaving certain property in trust, in equal shares and under like conditions, to her two sons and their heirs, and providing for certain contingencies that might arise by reason of death without issue. She afterwards died, and the Madison Safe Deposit and Trust Company became trustee of that trust. The conveyance by the widow of the interest in the estate of her husband in trust was made in consideration of like conveyances by her sons. It is recited in the deeds of trust that the conveyances are prompted by a consideration of the welfare of the grantors, and also of their children, "so far as such welfare may be prompted by the conservation of such estate, they now believe and therefore desire, for the safe and careful management and preservation of said estate, that the funds, assets and property of said estate, or a very large proportion thereof, should be assigned and conveyed to a trustee to be held in trust for the use of said heirs and children." The conveyances provide that "the ample and absolute power is hereby given and granted said trustee to sell, transfer and assign" any of the securities, bonds, stock, or other choses in action, or other personal property of the said trust estate, however or whenever the same may be acquired by the trustee, and to sell and convey the real estate, or any part thereof, or any other real estate, which said trustee may acquire, and that the proceeds of all such sales, whether of real or personal property, shall fall into and become a part of said trust estate. It is provided further that "gen-

eral and ample powers are given and granted to said trustee to direct, control, manage, invest, and reinvest and negotiate funds, moneys, securities, choses in action, assets and property of said trust estate, for the betterment and improvement of the same and for the general welfare of the said beneficiaries, but subject always to the approval and orders of the court." It is provided that the sales, transfer, and investment of funds referred to shall be made only upon the written petition of the trustee, approved by the Jefferson Circuit Court. It is provided that "said trustee shall collect and receive all the income, rents, and profits of said trust estate, and shall disburse and distribute the same as herein provided and declared. Said trustee shall first pay from the incomes, rents and profits of said trust estate all taxes, assessments, and other legal charges, or liens which may be laid or levied upon or against the property of said trust estate, and all proper and reasonable expenses and charges incurred in the due administration of said trust estate, and for all necessary and proper repairs of any real property of said trust estate, and to keep the same insured against loss by fire. After full payment of taxes, assessments, repairs, insurance premiums, expenses of administration, and other proper and legal charges as herein directed to be paid from the incomes, rents and profits of said trust estate, said trustee shall divide the residue of said incomes, rents and profits" between the beneficiaries of the trust.

In 1920 the trustee received a stock dividend of 100 per cent on 20 shares of the common stock of a corporation which was a part of the property of the trust when it was created. A certain insurance company, stock in which was a part of the original trust, was liquidated. At the time the trustee was appointed this stock was appraised at $15,180. Upon liquidation the

trustee received $18,773.22. Stock in another corporation was inventoried at the beginning of the trust at $800 and afterwards sold for $1,000. The trustee was the owner of stock in a certain bank of Louisville, Kentucky. Stock rights were issued to the shareholders upon the occasion of the bank increasing its capitalization. These rights had a market value of $300 per share or $1,500, and they were sold for that amount by the trustee. The amount was credited to the corpus of the estate. It appears that the original shares were worth $800 before the issue of the new stock, and $500 after it was issued. The plaintiffs, by their complaint, sought an interpretation of the trust agreement that would require the trustee to deliver to the life tenants the stock dividends and profits resulting from the sale of stock, the amount received as liquidating dividends in excess of the appraised value of the stock in the liquidating corporation at the time the trust was created, and the proceeds of the sale of the stock rights referred to. The trustee had allocated all of these items to the corpus of the trust. There was judgment for the defendants, from which this appeal is taken.

Appellees contend that appellants' action was for a declaratory judgment, and that, since the action of the trustee in allocating the funds in controversy to the corpus of the trust had been reported to the court and approved, the action is a collateral attack upon the judgment of approval. But, as we interpret the complaint, it is not an action for a declaratory judgment, although there are recitals that would be appropriate in such an action. It states a cause of action for an interpretation of the trust agreements by the court administering the trusts, and asks judgment against the trustee ordering payment, and all further equitable relief. The Jefferson Circuit Court is a court

of general jurisdiction, and has jurisdiction of all civil, equitable, and probate proceedings in Jefferson county. The action should perhaps have been filed as a petition in the matter of the administration of the trusts upon the docket of the court. It seems to have been filed as an independent action, but, since it was filed in the court where the trusts were being administered, and, since it was tried in the same manner as though it had been filed as a petition in the trust proceeding, and, since the substantial rights of the parties were not affected, we will treat the proceeding as a petition to construe the trust instruments, and for judgment directing the trustee to make settlement with the plaintiffs according to the court's determination.

The merits of the controversy involve an interpretation of the trust instruments. Whether the plaintiffs are entitled to receive the sums for which they contend must be determined by the intention of the settlors of the trust as expressed in or implied from the trust instruments. From the language quoted it would seem that the creators of the trust intended that the income, rents, and profits should go to the life interest, preserving the body of the estate, the principal, for the ultimate distributees. We assume that the words "rents and profits" were used in connection with the real estate involved in the trust, since they are words in common use in instruments referring to rights in real property to denote the current earnings of the property as distinguished from the principal invested in the property, or in profits arising from an advantageous sale, and therefore the expression, "income, rents, and profits," must be treated as intended to mean income. The trust estate has from its inception consisted of various items of personal property, including common stock in several corporations, and certain items

of real estate. If there were no changes in investment, and if no items of personal property were lost by becoming valueless, the problem would be comparatively simple. If a sum of money is placed in trust, the earnings on the same to go to a certain person for life, with remainder to another, it might well be urged that profits from the sale of investments, which if kept in the trust would increase the corpus above the original sum, should properly go to the life tenant. But this involves a consideration of the liability of current earnings to replace losses in investments to maintain the trust in its original proportions.

The trust agreements provide that the proceeds of sale of real or personal property shall fall into and become a part of the trust estate, and this we feel to be a sufficient expression of the will of the settlors to require that the proceeds of the sale of any such items which were a part of the original trust estate must fall into the corpus of the trust, notwithstanding the proceeds may exceed the appraised or estimated value of the item at the time the trust was created.

From the introductory clause, and from the entire instruments, we must conclude that there was a desire and intention to preserve the body of the trust for the children who were intended ultimately to have it, but there is no provision indicating an intention that distribution of earnings to the life interest should be curtailed in order to maintain the value of the trust if losses occurred. The clause which confers "general and ample powers" to the trustee to deal with the property of the trust "for the betterment and improvement of the same and for the general welfare of the said beneficiaries, but subject always to the approval and orders of the court," is urged upon us as

indicating a desire and intention that the body of the estate should be increased, although "the general welfare clause" seems to have been relied upon to authorize the trustee, with the approval of the court, to make distribution to the plaintiffs, who were life tenants, out of the corpus of the trust, when their needs seemed to require it, and more than $4,000 was thus distributed to the plaintiffs. If discretion so broad is granted it must carry with it the power and discretion to at least reimburse the trust out of income or profits, if not to withhold part of the income or profits, should the general welfare of the beneficiaries require so doing in the opinion of the trustee and the court. Since the plaintiffs have requested and received part of the principal of the trust, it may well be urged that they are not in a position, while retaining the same, to insist that the trustee and the administering court are bound by a hard and fast rule to distribute all net profits to them and retain all of the principal in the body of the trust. The express language of the trust instruments is such as to require that funds received upon a sale of any item of trust property shall go into the body of the trust, and this rule must apply to liquidating dividends, since they are not paid on account of earnings or profits, but as a return of capital invested.

There is no expression in the instruments indicating specifically the intention of the settlors in respect to stock dividends and the proceeds from the sale of stock rights unless their disposition was left to the discretion of the trustee under the broad general powers above referred to, and we must therefore determine whether such items are income or capital recovered. The question presents many difficulties. It has never been passed upon by the courts of this state. It has, however, been considered by many courts in other jurisdictions, and

there is much conflict in the authorities. Under the Kentucky rule stock dividends go in their entirety to the life interest. This rule is followed in Delaware, and in the early decisions, in the State of New York where, however, the rule has been abrogated by statute. Under the Massachusetts rule the stock dividend goes to the corpus of the trust. This is the rule adopted in England, by the Supreme Court of the United States, and by the Supreme Courts of Michigan, Missouri, Connecticut, Georgia, Illinois, Maine, North Carolina, Ohio, Rhode Island, and West Virginia. Under the Pennsylvania rule it is apportioned between the corpus and the life beneficiary in such a way as to prevent loss to the corpus by a reduction in the intrinsic value of the original shares as of the date when the life interest accrued. This rule is followed in California, Maryland, Minnesota, New Hampshire, New Jersey, South Carolina, Vermont, and Wisconsin. The theories supporting these various views, and the opinions of the courts referred to, are reviewed at great length in notes in 24 A. L. R. 9, and 72 A. L. R. 981. They are also discussed elaborately and at length in chapter 40 of Bogert (1935) on trusts and trustees. In the last work cited it is said (section 857) : "It is believed that the trend of recent opinion has been that the Massachusetts rule is the more desirable doctrine," and the annotation last referred to expresses the same view. The Pennsylvania rule seeks to do justice between the life beneficiary and the remainderman by dividing stock dividends between them if earned partly before and partly after the creation of the trust. This is upon the theory that a stock dividend converts earnings into capital, but it was said by an English court, in *Bouch* v. *Sproule* (1887), L. R., 12 App. Cas. 385, 24 A. L. R. 24: " 'When a testator or settlor directs or permits the subject of his disposition

to remain as shares or stocks in a company which has the power either of distributing its profits as dividend or of converting them into capital, and the company validly exercises this power, such exercise of its power is binding on all persons interested under the testator or settlor in the shares, and consequently what is paid by the company as dividend goes to the tenant for life, and what is paid by the company to the shareholder as capital, or appropriated as an increase of the capital stock in the concern, inures to the benefit of all who are interested in the capital.' " In operation, the Pennsylvania rule has given rise to much difficulty by reason of the fact that it requires the trustee at his peril, or the court to which he applies for advice, to determine the value of the stock at the time the trust was created, and at the time the dividend is declared, in order to ascertain whether the stock dividend has reduced the value of the stock, and if so what proportion of the dividend is to be treated as capital. In one Pennsylvania case market value was said to be the proper basis of the determination. In another it was held to be actual value and not the book value. In another case it was said that "going concern" value is a matter that must be considered; that "market value has nothing to do with such distributions; under all the situations which arise only the intact value is to be considered." *Jones* v. *Integrity Trust Co.* (1928), 292 Pa. 149, 155, 140 Atl. 862, 864. Concerning these difficulties, the Supreme Court of Michigan *In re Joy's Estate* (1929), 247 Mich. 418, 431, 225 N. W. 878, 72 A. L. R. 973, said:

> "The trustee must, however, under the apportionment rule, make a comparison of values at the inception of the life estate and the declaration of the stock dividend. Assuming that he must determine the real or actual intrinsic value, in which value as

a 'going concern' should be considered, we know of no method by which he may do so. While he might secure access to the books of the corporation, unless it be a foreign one, it would, we think, be impossible for him, or an accountant whom he might employ, to determine therefrom just when its earnings were accumulated, its losses sustained, or the increase in value of its assets occurred, and these must be specifically fixed as of the date when the values of the stock are to be determined. The value as a 'going concern' might be largely increased or lessened from year to year by a change in corporate management.

"This difficulty is further illustrated by the fact that in the case before us eminent counsel, representing the life beneficiary, the residuary legatee, and the trustee of the estate, disagree with the trial court and with each other in the application of the apportionment rule. That such a disagreement may at times be expected appears from the opening paragraph in *Jones* v. *Integrity Trust Co.* (1928), 292 Pa. 149, 140 Atl. 862 (a case decided by the court which originated the rule, and in which it has been enforced for more than 70 years) : 'The question involved in this case is: How shall certain stock, received by the defendant trust estate as the result of an extraordinary stock dividend of 25 per cent. be divided between the corpus of the trust and the life tenant who is entitled to the income thereof? To this, the court below, appellant and appellee have each given a different answer . It is certain, therefore, that two of them must be wrong; in reality all three are.' "

In *D'Ooge* v. *Leeds* (1900), 176 Mass. 558, 560, 57 N. E. 1025, the court said:

"In considering the distribution to determine its character, substance and not form is regarded. The simple question in every case is whether the distribution made by the corporation is of money to be spent as income, or is of capital to be held as an investment in the corporation. While this arbitrary rule may sometimes defeat the intention of the testator, in most cases it accomplishes the result intended, and there were practical considera-

tions as well as principles which required the adoption of it. The property of a corporation, in whatever way obtained, belongs, in the first instance, to the corporation and not to the stockholders. It may be used and managed as the interests of the corporation require. Sometimes it is desirable to divide the greater part of the earnings as income as soon as they are received. Sometimes it is important to retain large accumulations of earnings as additions to the original property and to make them a part of the permanent capitalization. Often it is desirable to keep in the business a large surplus to provide for losses or other contingencies which cannot be foreseen. For these reasons, as well as because of ownership, it is well that corporations should be permitted to determine for themselves how much of their earnings they will divide as income and how much they will retain as capital."

In *Gibbons* v. *Mahon* (1890), 136 U. S. 549, 10 S. Ct. 1058, it is said:

"Money earned by a corporation remains the property of the corporation, and does not become the property of the stockholders, unless and until it is distributed among them by the corporation. The corporation may treat it and deal with it either as profits of its business, or as an addition to its capital. Acting in good faith and for the best interests of all concerned, the corporation may distribute its earnings at once to the stockholders as income; or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years; or it may retain portions of its earnings and allow them to accumulate, and then invest them in its own works and plant, so as to secure and increase the permanent value of its property.

"Which of these courses shall be pursued is to be determined by the directors, with due regard to the condition of the company's property and affairs as a whole; and, unless in case of fraud or bad faith on their part, their discretion in this respect cannot be controlled by the courts, even at the suit of owners of preferred stock, entitled by express

agreement with the corporation to dividends at a certain yearly rate, 'in preference to the payment of any dividend on the common stock, but dependent on the profits of each particular year, as declared by the board of directors.' *New York, Lake Erie & Western Railroad* v. *Nickals,* 119 U. S. 296, 304, 307 (7 S. Ct. 209, 30 L. Ed. 363).

"Reserved and accumulated earnings, so long as they are held and invested by the corporation, being part of its corporate property, it follows that the interest therein, represented by each share, is capital, and not income, of that share, as between the tenant for life and the remainderman, legal or equitable, thereof.

"Whether the gains and profits of a corporation should be so invested and apportioned as to increase the value of each share of stock, for the benefit of all persons interested in it, either for a term of life or of years, or by way of remainder in fee; or should be distributed and paid out as income, to the tenant for life or for years, excluding the remainderman from any participation therein; is a question to be determined by the action of the corporation itself, at such times and in such manner as the fair and honest administration of its whole property and business may require or permit, and by a rule applicable to all holders of like shares of its stock; and cannot, without producing great embarrassment and inconvenience, be left open to be tried and determined by the courts, as often as it may be litigated between persons claiming successive interests under a trust created by the will of a single shareholder, and by a distinct and separate investigation, through a master in chancery or otherwise, of the affairs and accounts of the corporation, as of the dates when the provisions of the will of that shareholder take effect, and with regard to his shares only."

*In re Joy's Estate, supra,* it is said (p. 426):

"A stock dividend does not work a severance of earnings from other corporate assets. What belonged to the corporation still remains such. When the surplus was capitalized, its earning power was in no way lessened. The beneficiary would thereafter be entitled to receive the income derived by

the trustees from this additional stock held by them. Should the whole or any part of the stock dividend have been allotted to her, she would then have had an integral interest in the assets of the corporation, which she might have disposed of at will. If the purpose of the trust was to protect against a spendthrift child, as it might well have been by the language used, the force of this reasoning would be apparent.

"Another result of the application of this rule may be noted: Suppose the trust provides for the payment of the income to A for life, and thereafter to B for life, and let us assume that the estate consists of 100 shares of stock in a corporation. If, during the lifetime of A, a stock dividend of 100 per cent. be declared, which does not impair the actual value of the stock, A would be entitled to it, and would thereafter receive the cash dividends from the 200 shares, while B, his successor in the trust, after A's death, would receive such dividends on but 100 shares, and A's estate on the other 100. Can it be assumed that the creator of such a trust would not be equally desirous of securing an income from the entire stock interest to B as to A?"

And, quoting again from the same case, it is said (p. 422):

"The Massachusetts rule is said to be arbitrary and inequitable; that it does not work justice as between the beneficiaries entitled to the income and the remaindermen. Rules of law, when not fixed by statute, are established to provide regulations for the orderly transaction of business by persons affected by them. They should be simple and easily understandable, and, when applicable to business transactions, should be as practical as the circumstances will permit. That such a result is reached by applying the Massachusetts rule admits of no doubt. When governed by it, a trustee may always be certain that he is right in the disbursements made by him. In the sense that he has no discretion, it is arbitrary. But, in common thought, we apprehend that the average man regards cash dividends as income and stock dividends as additions to his capital, and that he has this in mind when

establishing a trust of this nature. If, however, he desires that the income beneficiary shall receive the whole or any part of the stock dividends distributed during the trust period, he may so direct, and the trustees will be governed thereby."

In New Jersey, where the Pennsylvania rule has been adopted, the rule was said to be a rule of property, which the court is unwilling to change, and, while adhering to the rule, the court questioned its logic in *Ballantine* v. *Young* (1911), 79 N. J. Eq. 70, 74, 81 Atl. 119, 120, saying:

"As a matter of logic, it is difficult to resist the reasoning leading to the conclusion that stock dividends are, in fact, principal; for the life tenant, as is universally held, is not, in the absence of fraud, or improper conduct, entitled to the earnings until they are distributed. They are not, in fact, distributed, but, on the contrary, put permanently into capital account when new stock is, without any money equivalent, allotted to the whole body of stockholders."

In *Stokes' Estate* (1913), 240 Pa. 277, 282, 81 Atl. 971, 973, is seen what might be interpreted as a doubt in the mind of the court as to the desirability of its own rule, when it said, after discussing the Massachusetts rule: "If such a rule is desired in Pennsylvania, we think the change should be made by the Legislature rather than by the courts."

In *In re Joy's Estate, supra,* the Supreme Court of Michigan concludes (p. 433):

"After due consideration of the reasons advanced by so many of our state courts for adoption of the Pennsylvania rule, we are of the opinion that Michigan should align itself with those in accord with the Massachusetts rule. In arriving at this conclusion, we are doubtless somewhat influenced by the practical difficulties, heretofore pointed out, which have been met with in applying a rule which provides for apportionment. When a testator may so easily express his intent with respect to such

dividends, his failure to do so should not impose upon a trustee the necessity of securing decision by review in this court before he can safely make disbursement of the dividends received by him."

We might multiply quotations and citations, but it would be fruitless to add further to the exhaustive discussions on the subject to be found in the authorities cited. We wish, however, to cite two cases from Missouri, one of the latest states to adopt the Massachusetts rule—*Robert* v. *Mercantile Trust Co.* (1929), 324 Mo. 314, 23 S. W. (2) 32; and *Hayes* v. *St. Louis Union Trust Co.* (1927), 317 Mo. 1028, 298 S. W. 91.

The intention of the testator or settlor of the trust is controlling. Ordinarily the owner of stock in a corporation treats stock dividends as representing increases in value of his capital holding rather than current income. It is as though real estate in which capital is invested increases in value. In estimating his wealth the owner increases the value of his capital holding, but does not treat the enhanced value as income. Increased income may be expected by way of larger rentals because of increased value, and so, where there are stock dividends they are ordinarily treated as indicating an increased value in the investment. Increased income would result from the cash dividends upon the new stock in addition to those received upon the old. Since the average owner would so treat the transaction, we must presume that he intends that the trustee of the trust which he has established shall so treat it. The owner of corporate stock relies upon the officers of the corporation acting in good faith to determine whether the surplus assets of the corporation shall be distributed as income to the stockholders or retained as necessary capital by the corporation, and where a testator or settlor of a trust has not ex-

pressed himself upon the subject, we must assume that he intends his trustee to do as he would have done. This is the Massachusetts rule, which we feel to be sound in principle, and which has the advantage of simplicity in operation. We therefore adopt it.

When the right to purchase new shares to be issued by a corporation acquires a market value it is because the new shares when issued will have a value in excess of the price at which they may be acquired, and correspondingly, the old shares will have a less value than they had before the new shares were issued. The value of the rights is measured by the decrease which will result in the value of the old shares which will correspond with the amount by which the value of the new shares will exceed their purchase price. This was the situation in the case at bar. The amount received upon the sale of stock rights corresponds with and compensates for the reduction in the value of the shares already held, and hence cannot, as we see it, logically be said to be income or earnings. It is but a return of part of the value of the investment. The same result would be reached, if there were no new stock and no stock rights to be sold, by a sale of a portion of the original stock. Therefore the same reasoning applies as in the case of stock dividends. The average stockholder, we assume, considers the proceeds of the sale of stock rights as a return of part of his capital investment to be reinvested, and we must assume that he intends his trustee to so consider it.

It follows that all of the items in controversy were properly allocated to the corpus of the trust.

Error is predicated upon the rulings of the court involving the admission of certain testimony, but, since the issue is determined upon fact concerning which there is no dispute, and the testimony in-

volved in the questioned rulings could not have affected the result, the errors, if any, were not prejudicial.

Judgment affirmed.

Tremain, J., not participating.