HELEN ELIZABETH HAUCK ET AL. *v.* THE SECOND NATIONAL BANK OF RICHMOND ET AL.

[No. 771A131. Filed September 11, 1972. Rehearing denied October 17, 1972. Transfer denied March 19, 1973.]

*Roy F. Schaeperklaus, Pearce and Schaeperklaus,* of Cincinnati, Ohio, *W. Ray Skirvin, Skirvin & Skirvin,* of Cincinnati, Ohio, *Russell H. Schussler, Harlan, Schussler & Keller,* of Richmond, for appellants.

*George R. Reller, Reller, Mendenhall, Kleinknecht & Milligan,* of Richmond, *H. Winston Hathaway and William T. Kerr,*

of *Landman, Hathaway, Latimer, Clink & Robb,* of Muskegon, Michigan.

### STATEMENT OF THE CASE AND FACTS

BUCHANAN, P.J.—Plaintiffs-Appellants, as beneficiaries under Elizabeth Anderson's Will (Elizabeth's Beneficiaries), appeal from an adverse declaratory judgment construing Item VI and Item VII of Fred S. Anderson's Will and a certain Trust Agreement between Elizabeth Anderson (Elizabeth) and the Second National Bank of Richmond as Trustee (Second Bank) in favor of Defendants-Appellees as beneficiaries under the Last Will and Testament and Codicil of Fred S. Anderson (Fred's Beneficiaries).

Two causes for a declaratory judgment, one for construction of Items VI and VII of the Will and Codicil of Fred S. Anderson (Cause 3941), and the other for construction of a Trust Agreement dated October 23, 1963 between Elizabeth Anderson and Second National Bank of Richmond (Cause 3942), were filed in the Wayne Circuit Court and consolidated for trial and are so treated on appeal. An agreed Statement of Facts and extensive Findings of Fact and Conclusions of Law, which are part of these proceedings, are summarized.

Fred S. Anderson (Fred) died December 17, 1932, testate, and was survived by his wife, Elizabeth Anderson (Elizabeth), who was appointed Executrix of his estate. He left no descendants.

By the terms of Item VI of Fred's Will, Elizabeth became a life tenant of his residual estate, with any undisposed of property then to redound to the benefit of Fred's sisters, nephew, and nieces (Fred's Beneficiaries).

Pertinent parts of Item VI of Fred's Will carrying out this testamentary scheme are:

"*ITEM VI.* All the rest, residue, and remainder of my property, both real and personal, and wheresoever situate, I give, devise, and bequeath to my wife, Elizabeth Anderson,

for her life, *with power in her to use and dispose of the same as her needs may require, and as to such property undisposed of at her death,* after the payment of my wife's last sickness and burial, I give, devise, and bequeath, as follows:

\* \* \*

(c) All property remaining I give, devise, and bequeath in equal shares, absolutely and in fee simple, to my sister, Mrs. Mabel VanEpps, my nephew, John VanEpps, my niece, Virginia VanEpps, all of Cleveland Heights, Ohio, my sister, Mrs. Georgia Davies, and my nieces, Jean Davies and Winifred Davies, all of Miami, Florida. \* \* \*" (Emphasis supplied.)

Item VII appointed Elizabeth as Executrix to serve without bond and provided that she need not report to any court as to her actions in such capacity and that on her death the Second Bank act as executor. Further, it provided that on her death the Second Bank as executor should sell and convert into money for distribution any property which was not in the form of bonds or securities.[1]

*On January 18, 1934,* Elizabeth filed her Final Report as Executrix and attached thereto her individual Receipt for securities with an inventory value of $73,879.10 and cash in the amount of $48.77, and a deed to certain real estate in the city of Richmond. The Receipt executed by her was received

---

1. *"ITEM VII.* I constitute and appoint my wife, Elizabeth Anderson, as executrix of my will, without bond, and I direct that during her life she shall not be required to report to the Court as to what property she is using, nor shall she be required to give bond to account for such property. At her death, I constitute and appoint the Second National Bank, of Richmond, Indiana, as executor of my will.

*Any of my property in the possession of my wife at the time of her death which is not in the form of stocks, bonds, or securities, I direct said Second National Bank, as executor, to sell and convert into money for distribution* in accordance with the terms of my will. Any real estate or property which, at such time, can not be disposed of without sacrifice, I direct said executor to hold for a reasonable time, if in its opinion greater value can be secured therefor. Full power is vested in said executor to sell and dispose of any of such property upon such notice and terms as it shall fix and determine." (Emphasis supplied.)

in evidence.[2] Fred's estate was thereafter closed in 1934 and no proceedings were had with respect thereto until May 3, 1965, when it was reopened with the Second Bank as Administrator d.b.n.

Elizabeth proceeded to invest and reinvest the property so received until October 23, 1963, when, at the age of 79 and being in ill health, she executed on that date a Trust Agreement (Trust Agreement) with the Second Bank as Trustee. Also on that date the Second Bank accepted the Trust and acknowledged receipt of certain property described in a schedule attached to the Trust Agreement marked Exhibit A (Exhibit A Assets).

Exhibit A attached to the Trust Agreement was titled "Schedule of Property Transferred." It listed in four columns a detailed description of the items included. They (Exhibit A Assets) consisted of various government and corporate and personal obligations, securities, and insurance contracts. Each item was described by serial number, date of acquisition, and the par value, cost or number of shares. Among other stocks listed therein was a certificate for 50 shares of the common stock of General Electric Company dated *April 18, 1933,* and a certificate for 61 shares of the common stock of Goodyear

---

2. "RECEIPT

I, Elizabeth Anderson, herewith acknowledge the receipt of securities of the inventoried value of Seventy-three Thousand Eight Hundred Seventy-nine and 10/100 Dollars ($73,879.10), and cash in the sum of Forty-eight and 77/100 Dollars ($48.77), and a deed from the sheriff of Wayne County, Indiana for real estate formerly owned by William J. Robbins at the northeast corner of South Eleventh and 'I' Streets, being a parcel of land 104 feet by 165 feet in Lot Number Fourteen (14) of certain outlots laid out by Ezekiel L. Cleaver in the City of Richmond, Indiana, all as shown in the foregoing report, this day delivered to me by Elizabeth Anderson, Executrix of the Last Will and Testament of Fred S. Anderson, deceased, and I agree to hold, use, and account for the same in accordance with the last will and testament of said Fred S. Anderson, deceased.

Witness my hand at Richmond, Indiana, this 18th day of January, 1934.

*Elizabeth Anderson*

WITNESS:
*Martha Connor*"

Tire & Rubber Company dated *April 26, 1933*. These two certificates are collectively herein referred to as "the 1933 Certificates." *All* other Exhibit A Assets were dated *subsequent* to January 18, 1934, at which time Elizabeth acknowledged receiving the original assets from Fred's estate.

Of the 137 items constituting Exhibit A Assets, *only* these two certificates, *i.e.*, the 1933 Certificates, were dated prior to January 18, 1934, and they involved only a small fraction of the total number of shares listed in the Exhibit A Assets. However, there was also listed additional share certificates of these two stocks for 100 shares of General Electric stock and additional share certificates for 1439 shares of Goodyear Tire & Rubber Company stock. Including the 1933 Certificates, this made a total of 150 shares of General Electric Company stock and 1500 shares of Goodyear Tire & Rubber Company stock, which had a combined market value of $90,000.00 and were collectively referred to by the trial court as the "Non-Life Assets." We shall refer to them in the same manner.

The Second Bank in its brief concedes that evidence was admitted from these two corporations indicating that no purchases were made of these two stocks (General Electric Company and Goodyear Tire & Rubber Company) after January 18, 1934, and it can be assumed "the balance of these two holdings came from stock splits and stock dividends on these original certificates." Thus there is a total of 28 stock certificates of 137 listed in the Exhibit A Assets which comprise the Non-Life Assets, 26 of which were dated like all Exhibit A Assets subsequent to January 18, 1934, leaving only the two 1933 Certificates dated prior thereto.

Evidence was admitted showing that neither Mr. Verlis A. Monroe, a Trust Officer of Second Bank who accepted the Trust on its behalf, nor Mr. Will Reller acting as attorney for Elizabeth in preparation of the Trust instrument, personally checked the Exhibit A Assets to determine whether the assets therein listed were in fact assets traceable to Fred's estate

in which Elizabeth had a life estate and for which she receipted on January 18, 1934.

The stated purpose of Elizabeth in creating the Trust was to carry out the dispositive plan of Fred's Will so that Fred's Beneficiaries as remaindermen would receive what they were entitled to pursuant to Item VI of Fred's Will. Having had sole direction and control of the property originally receipted for by her on January 18, 1934 under the terms of Fred's Will, the Trust recognizes this fact and recites that *"all of such property, real and personal, originally passing to me has been disposed of and the proceeds thereof invested and reinvested by me, a schedule of all of said property as now existing being attached hereto marked 'Exhibit A.'"* (Emphasis supplied.)

Other recitals in the Trust Agreement set out Item VI and Item VII of Fred's Will verbatim; that Elizabeth delivered to herself as widow "certain mortgage bonds, *shares of stock and cash* * * * and a Deed * * *" (emphasis supplied) ; and expressed her desire because of age and ill health to be relieved of "the administration of said property in said life estate" in favor of the Second Bank as Trustee.

The terms of the Trust Agreement then provided that "all of the property described on said Exhibit A attached hereto, together with any accruals thereto and dividends and income therefrom," be held by the Second Bank until Elizabeth's death and at that time the property to be distributed according to Item VI of Fred's Will.

Other pertinent extracts of the Trust Agreement are:

## "TRUST AGREEMENT

WHEREAS, Fred S. Anderson who died December 17, 1932, by his will dated January 10, 1931, and Codicil thereto dated June 16, 1932, which were duly probated in the Wayne Circuit Court at Richmond, Indiana, on December 21, 1932, provided as follows:

*ITEM VI.*—[repeated verbatim from Fred's Will] and,

WHEREAS, by Item VII of said will it was provided as follows:

*ITEM VII.*—[repeated verbatim from Fred's Will] and,

WHEREAS, I the undersigned, *Elizabeth* Anderson, in making my final settlement as Executrix of said estate, *delivered to myself as widow* of said decedent, *certain mortgage bonds, shares of stock* and cash of the inventoried value of Seventy-three Thousand Nine Hundred Twenty-seven Dollars and Eighty-seven Cents ($73,927.87) and a Deed for a parcel of real estate at the Northeast corner of South Eleventh and 'I' Streets, in the City of Richmond, Indiana, being a parcel of land One Hundred Four Feet (104) by One Hundred Sixty-five Feet (165) in Lot No. Fourteen (14) of certain out lots laid out by Ezekiel L. Cleaver, *all as shown in my final report as said Executrix dated January 18, 1934,* and approved by said court, *all of which property passed to me as decedent's widow for my lifetime* with power in me to use and dispose of the same as provided for in decedent's will, and,

WHEREAS, *all of such property, real and personal, originally passing to me has been disposed of and the proceeds thereof invested and reinvested by me, a schedule of all of said property as now existing being attached hereto marked 'Exhibit A,'* and,

WHEREAS, because of my age and ill health, I now desire to be relieved of the administration of said property in said life estate and desiring to place the administration and final distribution of said property with The Second National Bank of Richmond as Trustee.

THEREFORE, THIS AGREEMENT WITNESSETH:

1. I Elizabeth Anderson herewith *transfer,* assign and deliver to *The Second National Bank* of Richmond, Richmond, Indiana, *all of the property described on said Exhibit A* attached hereto, *together with any accruals thereto* and dividends and income therefrom, the same to be held by said Bank in trust and as Trustee for my benefit *and for the benefit of all of the beneficiaries as designated in the will of said decedent* and the Codicil thereto at my death, *and all in conformity with the provisions of said will* and Codicil thereto.

\* \* \*

3. During my lifetime, said Trustee shall apply all income collected and received by it from said trust property to the payment of all expenses of administering said trust and all taxes payable with respect to the principal and income from said trust and the proper fees of said Trustee

and the net income so remaining shall be paid to me at least quarterly or credited to my checking account at said Bank.

4. In accordance with provisions of decedent's will, at my death the expenses of my last sickness and burial shall be paid.

5. Decedent's will provides that I may use the principal in said life estate if my needs shall require. Heretofore, I have not found it necessary to invade said principal and the same is not to be used by said Trustee for my needs unless I shall so notify said Trustee. In the event of my incapacity and consequent inability to so notify said Trustee, then I direct said Trustee to use such of said principal from time to time as it deems necessary to meet my needs, but before invading said principal for such purposes, I desire that the income from my own individual property and the net income from the property in this trust shall first be used for my needs." (Emphasis supplied.)

Elizabeth thereafter died on March 2, 1965, testate, the beneficiaries of her Will being different beneficiaries than Fred's Beneficiaries. Evidence admitted showed Elizabeth had accumulated substantial separate property during her lifetime and the inventory of her assets did not include any of the Exhibit A Assets or accruals thereon. The Second Bank was appointed Executor of her Will and also served as Executor of Fred's estate, which was reopened after Elizabeth's death.

The Statement in Lieu of Inventory filed by the Second Bank in reopening Fred's estate consisted of the Exhibit A Assets, which were shown to have a market value of $450,537.84. The Exhibit A Assets were not included in Elizabeth's estate.

The Second Bank served as Executor of both estates and as Trustee under the Trust Agreement. The Second Bank's attorneys represented it in these three representative capacities. Elizabeth's Beneficiaries attempted to remove Second Bank (and its attorneys) by filing a Petition For Appointment of a Special Administrator in Elizabeth's estate, which the trial court orally denied.

The trial court found the Trust Agreement to be a valid one and not invalid for uncertainty. It also found that a conflict and ambiguity existed in the Trust Agreement "with regard to reference therein to assets traceable and resulting from the life estate provided for in Item VI of the Fred Anderson Will * * * and the assets designated by the Trust Agreement [Exhibit A Assets] as constituting the trust property at the time of the execution of said Trust Agreement *in that at least some of the designated trust assets did not originate from the said life estate assets.*" (Emphasis supplied.) In order to explain the "ambiguity" so created, considerable testamentary and other evidence was admitted relating to the facts and circumstances surrounding the creation and execution of the Trust Agreement, the acquisition, management and treatment of the property constituting the Exhibit A Assets by Elizabeth, her capability as a successful businesswoman and meticulous record keeper, all of which led the trial court to conclude that Elizabeth "had knowingly included" Non-Life Assets among the Exhibit A Assets. The court speculated as to the reasons why the Non-Life Assets were included in the Exhibit A Assets and found there was evidence indicating that they "may well have come originally from Fred Anderson."

Accordingly, the court then entered judgment approving distribution of the Exhibit A Assets including the Non-Life Assets, which included accumulation of income and appreciation; that the Trust Agreement was not in any way inconsistent with Fred's Will or the law affecting Elizabeth's life estate; that the Exhibit A Assets should be taxable if at all as assets in Fred Anderson's estate and all other assets passing through Elizabeth's trust should be taxable if at all as assets of Elizabeth's; that at the time of the sale or conversion of the original assets receipted for by Elizabeth on January 18, 1934, there was no relationship, debtor, creditor or otherwise created whereby Elizabeth as life tenant was only obligated to pay to Fred's Beneficiaries as remaindermen the value of the life estate received by her on January 18, 1934;

that the term in Item VI of Fred's Will, "as her needs may require," restricted only the principal and not the income which the life estate created; and that Elizabeth was entitled to full unrestricted use of the income during her lifetime.

*ISSUES*—The issues posed by this appeal are:

*ISSUE ONE.* Was it reversible error for the trial court to admit extrinsic evidence to explain an "ambiguity" in the Trust Agreement?

*ISSUE TWO.* Should a Special Administrator have been appointed in Elizabeth's estate because of a conflict of interest resulting from Second Bank (and its attorneys) serving as personal representative in both Fred's and Elizabeth's estates?

*ISSUE THREE.* Does appreciation in the value of assets constituting a life estate (the Exhibit A Assets) pass to the remaindermen (Fred's Beneficiaries) upon the death of the life tenant (Elizabeth)?

*ISSUE FOUR.* Did the trial court commit reversible error by holding that the appreciated life estate assets of Fred's estate (the Exhibit A Assets) should be taxable, if at all, as assets in Fred's estate?

As to *ISSUE ONE,* Elizabeth's Beneficiaries appear to argue that Fred's Will and the Trust Agreement should be strictly construed to limit the assets passing to Fred's Beneficiaries to those which could clearly be traced to the original assets receipted for by Elizabeth excluding the Non-Life Assets and any increment arising therefrom. In the alternative, they would have the Trust Agreement declared totally void for vagueness and uncertainty and would put the burden on Fred's Beneficiaries to show by clear and convincing evidence that a gift was intended by Elizabeth to Fred's heirs of the Exhibit

A Assets or the Non-Life Assets that rightfully belonged to Elizabeth's estate and her legatees.

Fred's Beneficiaries take the position that the trial court properly admitted extrinsic evidence which clearly demonstrated Elizabeth's intent, for whatever reasons, to transfer the so-called Non-Life Assets to Fred's Beneficiaries and that there was no mistake with respect thereto.

As to *ISSUE TWO*, Elizabeth's Beneficiaries specify no misconduct on the part of Second Bank or its attorneys by virtue of their acting as personal representative in the two estates, nor do they claim harm resulting therefrom. Their contention is that the existence of adversary interests in the two estates alone is sufficient conflict of interest to require Second Bank's removal as personal representative in Elizabeth's estate.

Fred's Beneficiaries state that there is no conflict of interest issue in the case as it was not in the court's Pre-Trial Order nor is there any evidence concerning same in the trial of the case.

As to *ISSUE THREE*, Elizabeth's Beneficiaries point to language in Fred's Will which they claim specifically expresses an intention on his part that any appreciation in the value of the life estate assets is the property of the life tenant and not of the remaindermen.

Fred's Beneficiaries quote the general rule that appreciation in the value of life estate assets is credited to the remaindermen rather than to the life tenant and find no exception to the general rule to exist.

As to *ISSUE FOUR*, Elizabeth's Beneficiaries argue there was no issue presented as to taxation and no evidence was introduced with respect thereto, and therefore the court's finding in this respect should be set aside.

The answer of Fred's Beneficiaries is that the trial court's Pre-Trial Order specifically referred to the question of liability

of Elizabeth's estate for taxes due and that the court has properly stated the law on this question.

## DECISION

*ISSUE ONE*—It is our opinion that while it was error for the trial court to admit extrinsic evidence to explain an "ambiguity" in the Trust Agreement, such action was not reversible error.

Surprisingly, in a case which reeks with the application of the parol evidence rule, neither the record nor the parties refer to this ancient exclusionary rule as such. The trial court and the parties, beginning with the Agreed Statement of Facts, have assumed an ambiguity existed in the Trust Agreement because of the existence of what the court characterized as the Non-Life Assets—even though they consisted of 28 stock certificates in all, only two of which certificates were dated prior to January 18, 1934, the date Elizabeth acknowledged receiving the original assets from Fred's estate and which later were transformed into the Exhibit A Assets.

Ingestion of the facts and events of this case has forced us into a fierce chase over hill and hummock between the record and the briefs of the parties. One certainty from that pursuit is that the court determined a conflict and ambiguity to exist in the Trust Agreement "in that at least *some* of the designated trust assets did not originate from original life estate assets." (Emphasis supplied.)

By this statement in its findings and judgment rendered thereon we must assume that the court based its reasoning on the inconsistency between the date of the 1933 Certificates and the date of January 18, 1934 (the date Elizabeth receipted for the original assets from Fred's estate). More specifically, the 1933 Certificates, dated prior to that date, were still listed in the Exhibit A Assets and could not have been "stock certificates" which could have been "disposed of" and invested and reinvested as recited in the Trust Agreement as evidenced by

Elizabeth's receipt received in evidence. Differently stated, the court found an ambiguity to arise from the recitation in the Trust Agreement that "all" of the property received by Elizabeth from Fred's estate was not invested and reinvested into Exhibit A Assets because two certificates of stock (the 1933 Certificates) listed in Exhibit A were still in existence as their prior date indicates, *i.e.*, she passed assets that could not have been included in "all" of the original assets she received from Fred's estate. In reaching this conclusion, the trial court constantly referred to the *Non-Life Assets,* which included a total of 28 stock certificates including the two 1933 Certificates—presumably because the 26 certificates resulted from stock splits and dividends which could only be determined by evidence *de hors* the record.

We reach a different conclusion. Looking at the Trust Agreement itself, which we are bound to do as will hereinafter appear, the only inconsistency or contradiction that appears on its face is that *the recitals* in the Trust Agreement establish that on January 18, 1934, Elizabeth received "shares of stock" from Fred's estate "all" of which she "disposed of" and the attached *Exhibit A* which contains two certificates dated in 1933. Out of a total of some 137 items listed in the Exhibit A Assets, only these two certificates, *i.e.*, the 1933 Certificates, have a date prior to January 18, 1934. This is an inconsequential misdescription or inaccuracy in an instrument otherwise lucid and forceful in its expression of the settlor's intent and does not rise to the dignity of an ambiguity.

Long established trust and evidence rules lead us to this conclusion.

The primary rule in construing trust instruments is that the court must ascertain the intention of the settlor and carry out this intention unless it is in violation of some positive rule of law or against public policy. *Powell* v. *Madison Safe Deposit & Trust Co.* (1935), 208 Ind. 432, 196 N. E. 324; *Sellers* v. *Milford* (1935), 101 Ind.

App. 590, 198 N. E. 456; *Brown* v. *Union Trust Co. of Greensburg* (1951), 229 Ind. 404, 98 N. E. 2d 901. The plain and unambiguous purpose and intention of the settlor must be determined only from the terms of the instrument itself without taking individual clauses out of context and considering same without reference to the whole instrument. *Elliott* v. *Travelers Ins. Co.* (1951), 121 Ind. App. 400, 99 N. E. 2d 274; *McNew* v. *Vert* (1908), 43 Ind. App. 83, 86 N. E. 969.

> Whenever possible, trust instruments will be construed in a manner which renders the trust operative and effective. *Crawfordsville Trust Co.* v. *Elston Bank & Trust Co.* (1940), 216 Ind. 596, 25 N. E. 2d 626.

The so-called "four corners" rule has long been the law in Indiana. It requires that as to any matter expressly covered by a written instrument or trust agreement, the provisions of that instrument, if unambiguous, determine the terms of the trust; the intention of the settlor will be determined within the four corners of the instrument. *Colbo* v. *Buyer* (1956), 235 Ind. 518, 134 N. E. 2d 45; *Lewis* v. *Burke* (1967), 248 Ind. 297, 226 N. E. 2d 332; *Ross* v. *Clore* (1948), 225 Ind. 597, 76 N. E. 2d 839; *Brown* v. *Union Trust Co. of Greensburg, supra; Fischer* v. *Kaylor* (1969), 145 Ind. App. 148, 250 N. E. 2d 19; *In Re Estate of Saltzman* (1969), 145 Ind. App. 488, 251 N. E. 2d 595; *Bigler* v. *Trinity Evangelical and Reformed Church of Indianapolis* (1964), 136 Ind. App. 320, 199 N. E. 2d 855.

All of which leads us to the logical extension of these rules of construction, the parol evidence rule. In Indiana it has been stated to be that in the absence of fraud, mistake, ambiguity, illegality, duress or undue influence, extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction. *Hart-Kraft Motor Co.* v. *Indianapolis Motor Car Co.* (1915), 183 Ind. 311, 109 N. E. 39; *Reisterer* v. *Carpenter*

(1889), 124 Ind. 30, 24 N. E. 371; *Conant* v. *Nat'l. State Bank of Terre Haute* (1889), 121 Ind. 323, 22 N. E. 250.

Unless the court can say from a consideration of the entire instrument that a given clause is ambiguous, extrinsic evidence is inadmissible *even to explain* the instrument's meaning. *Whelchel* v. *Barton* (1951), 122 Ind. App. 81, 102 N. E. 2d 917.

The parol and extrinsic evidence rules are designed to give certainty to a transaction which has been reduced to writing by protecting the parties against the doubtful veracity of interested witnesses and the uncertain memory of disinterested witnesses. *National Bank & Trust Co. of South Bend* v. *Becker* (1962), 38 Ill. App. 2d 307, 187 N. E. 2d 355; *Fogelson* v. *Rackfay Construction Co.* (1950), 300 N. Y. 334, 90 N. E. 2d 881.

With the purpose of the parol evidence rule before us, we look to those situations where extrinsic evidence is admissible. If an ambiguity does exist, it is admissible to *explain* the writing or to make plain the meaning or intention of the parties, but such evidence is not admissible to *vary* or *contradict* the writing. *Alexander* v. *Capitol Lumber Co.* (1913), 181 Ind. 527, 105 N. E. 45; *Warner* v. *Marshall* (1905), 166 Ind. 88, 75 N. E. 582; *Bandy* v. *Meyers* (1966), 138 Ind. App. 202, 213 N. E. 2d 344.

Generally, ambiguities are of two types, patent and latent. A patent ambiguity is apparent on the face of the instrument and arises by reason of an inconsistency or inherent uncertainty of language used so that the effect is either to convey no definite meaning or a confused meaning. Extrinsic evidence is not admissible to explain or remove a patent ambiguity. See: *Porter* v. *Byrne* (1858), 10 Ind. 147; *Munger* v. *Green* (1863), 20 Ind. 39; *Baldwin* v. *Kerlin* (1874), 46 Ind. 427.

A latent ambiguity arises not upon the face of the instrument by virtue of the words used, but emerges in attempting

to apply those words in the manner directed in the instrument. Extrinsic evidence is admissible to explain or clear up a latent ambiguity. *Miller* v. *Coulter* (1900), 156 Ind. 290, 59 N. E. 853; *Skinner* v. *Harrison Township* (1888), 116 Ind. 139, 18 N. E. 529; *Daugherty* v. *Rogers* (1889), 119 Ind. 254, 20 N. E. 779.

Lord Bacon's ancient rule that a latent ambiguity may be explained by extrinsic evidence, but a patent ambiguity may not, has been followed in many jurisdictions, including Indiana. However, application of the rule has led to considerable uncertainty and often has been rejected. The basis for the rule is said to be that where the doubt does not appear on the face of the instrument, introduction of extrinsic evidence merely completes the instrument by identifying its object or subject matter. On the other hand, if the doubt is apparent on the face of the instrument and the writing is too uncertain for a settled construction admission of extrinsic evidence would, in effect, create a new instrument. In general, *see:* 32A C. J. S. *Evidence* § 961, p. 426 *et seq.*

So, if a written instrument is so worded that it can be definitely interpreted and its terms carried out within the instrument by applying that language to the subject matter thereof without contradiction, then the instrument cannot be termed uncertain or ambiguous and extrinsic evidence is not admissible to vary or contradict its meaning. *Oriental Refining Co.* v. *Hallenbeck* (1952), 125 Colo. 7, 240 P. 2d 913; *In Re Estate of Saltzman, supra.*

While it is generally agreed that parol and extrinsic evidence is admissible to explain a latent ambiguity in a written instrument, the parol evidence rule does not apply to every situation where there may seem to be some ambiguity. *Lundin* v. *Hallmark Productions, Inc.* (1958), 161 Cal. App. 2d 698, 327 P. 2d 166. Even where an apparent ambiguity may appear, parol and extrinsic evidence is not admissible to aid in the interpretation of the

instrument *until the four corners of the instrument have been searched* to ascertain whether the instrument itself affords a reasonably clear understanding of what the creator intended. *Richards Development Co.* v. *Sligh* (1961), 89 Ariz. 100, 358 P. 2d 329; *Elliott* v. *Travelers Ins. Co., supra.*

A mere lack of clarity on a casual reading of an instrument is not sufficient grounds to determine whether the instrument is afflicted with an ambiguity warranting the admission of parol and extrinsic evidence to explain its meaning. Nor is an instrument ambiguous merely because it may be difficult to construe. No ambiguity can be said to exist until an application of the rules of interpretation leaves the instrument uncertain which of two or more possible meanings represents the true intention of the testator. *Goff* v. *Cooper* (1964), 110 Ga. App. 339, 138 S. E. 2d 449; *McCann* v. *Glynn Lumber Co.* (1945), 199 Ga. 669, 34 S. E. 2d 839.

A written instrument is ambiguous if it is reasonably susceptible of different constructions. It is not ambiguous if the court can determine its meaning without a guide other than a knowledge of the facts on which, from the nature of the language used, its meaning depends. *Whiting Stoker Co.* v. *Chicago Stoker Corp.* (7th Cir. 1948), 171 F. 2d 248. Conversely, if a written instrument is so worded that it can be given a certain or definite meaning or interpretation, it is not ambiguous. *Universal C. I. T. Credit Corp.* v. *Daniel* (1951), 150 Tex. 513, 243 S. W. 2d 154.

If an apparent ambiguity can be reconciled from a reasonable interpretation of the instrument, extrinsic evidence should not be admitted. *Continental Bank & Trust Co.* v. *Bybee* (1957), 6 Utah 2d 98, 306 P. 2d 773; *Penn Star Mining Co.* v. *Lyman* (1924), 64 Utah 343, 231 P. 107; *Lundin* v. *Hallmark Productions, Inc., supra.*

This court said in *Wallace* v. *Cutsinger* (1917), 66 Ind. App. 185, 115 N. E. 789;

"In order for the meaning of a will to be clear from the language used, *it is not necessary for it to be so worded as to exclude every other possible meaning* which might be suggested as a matter of speculation or conjecture. The meaning of a will may be said to be clear when it fairly expresses an intention on a reasonable interpretation of the language used, *regardless of other possible intentions not apparent but which must be reached through a forced construction,* or circuitous reasoning." (Emphasis supplied.) *See* also: *Fischer* v. *Kaylor* (1969), 145 Ind. App. 148, 250 N. E. 2d 19; *In Re Estate of Saltzman, supra.*

Written instruments are not rendered ambiguous by the mere fact that there is disagreement as to their proper construction. *Whiting Stoker Co.* v. *Chicago Stoker Corp., supra.*

The argument of Elizabeth's Beneficiaries that the Trust Agreement should be declared totally void for vagueness and uncertainty fails in that it attempts to inflate out of all proportion an inconsequential inaccuracy. This kind of a misdescription in no way comes within the rule that extrinsic evidence is not admissible to explain or remove a patent ambiguity and therefore the whole instrument is void or uncertain, as was true in certain old Indiana cases—*Porter* v. *Byrne, Munger* v. *Green,* and *Baldwin* v. *Kerlin, supra.* The Trust Agreement can be interpreted on its face in such a way as to fully carry out the clearly expressed intention of the Trust Agreement and Fred's Will. We consider the inconsistency between the date appearing on the 1933 Certificates listed in the Exhibit A Assets and the date of January 18, 1934 appearing in the recitals as minimal. This involved no incurable or hopeless uncertainty.

Using the word "ambiguity" in its broad sense of doubtfulness, uncertainty, or double meaning, this minor contradiction does not warrant the introduction of extrinsic evidence in violation of the parol evidence rule. The small shadow cast by this inaccuracy is blotted out by the white light of the overwhelmingly expressed intent of the author of the Trust Agreement.

In arriving at this conclusion, we point to specific support from *Whelchel* v. *Barton, supra,* where the word "equipment" was held to include a truck, and numerous other Indiana and foreign cases showing a distinct tendency to refuse to admit extrinsic evidence to vary or contradict or declare void a written instrument where the intention of the party or parties involved is clearly expressed within the instrument itself. *Powell* v. *Madison Safe Deposit & Trust Co., supra; Sellers* v. *Milford, supra; Brown* v. *Union Trust Co. of Greensburg, supra; Elliott* v. *Travelers Ins. Co., supra; McNew* v. *Vert, supra; Crawfordsville Trust Co.* v. *Elston Bank & Trust Co., supra; Colbo* v. *Buyer, supra; Lewis* v. *Burke, supra; Ross* v. *Clore, supra; Fischer* v. *Kaylor, supra; In Re Estate of Saltzman, supra; Bigler* v. *Trinity Evangelical and Reformed Church of Indianapolis, supra; Hart-Kraft Motor Co.* v. *Indianapolis Motor Car Co., supra; Reisterer* v. *Carpenter, supra; Conant* v. *Nat'l. State Bank of Terre Haute, supra; Welchel* v. *Barton, supra; Alexander* v. *Capitol Lumber Co., supra; Warner* v. *Marshall, supra; Bandy* v. *Meyers, supra; Porter* v. *Byrne, supra; Munger* v. *Green, supra; Baldwin* v. *Kerlin, supra; Richards Development Co.* v. *Sligh, supra; Goff* v. *Cooper, supra; McCann* v. *Glynn Lumber Co., supra; Whiting Stoker Co.* v. *Chicago Stoker Corp., supra; Universal C. I. T. Credit Corp* v. *Daniel, supra; Continental Bank & Trust Co.* v. *Bybee, supra; Penn Star Mining Co.* v. *Lyman, supra; Wallace* v. *Cutsinger, supra; Fischer* v. *Kaylor, supra.*

The parol evidence rule should have been applied to exclude all extrinsic evidence, but we agree with Judge Lowdermilk's statement in *In Re Estate of Saltzman, supra,* in construing a will found to be unambiguous where extrinsic evidence had been admitted by the trial court, "the admission of evidence to construe the will was harmless * * *" and:

"For us to reverse and remand this cause because of the admission of extrinsic evidence to construe the will would be to require the doing of a useless thing in that the trial

court, after rehearing the case would necessarily come to the same result, said will being unambiguous and needing no construction."

*ISSUE TWO*—No error was committed by the trial court's refusal to remove the Second Bank and appoint a Special Administrator for Elizabeth's estate merely because of an alleged conflict of interest resulting from the Second Bank serving as personal representative of both Fred's and Elizabeth's estates.

The Petition filed by Elizabeth's Beneficiaries for Appointment of a Special Administrator seeking removal of the Second Bank as Executor of Elizabeth's estate and for the appointment of a Special Administrator in its stead was denied by the court. While this issue was not part of the Pre-Trial Order determining the issues, Elizabeth's Beneficiaries preserved the question in their Motion to Correct Errors and point to certain evidence which indicates the issue was before the court.

It is significant that Elizabeth's Beneficiaries do not claim harm resulting from the Second Bank acting in a dual capacity in the two estates. Neither do they specify any misconduct on the part of the Second Bank or its attorneys other than to refer to certain evidence which they interpret as indicating favoritism on the part of one of the attorneys with reference to the allocation of Exhibit A Assets. In overruling the Motion to Correct Errors and in denying the Petition for Appointment of a Special Administrator, the trial court found against Elizabeth's Beneficiaries on this factual issue and we cannot say that it was "clearly erroneous" in doing so—Rule TR. 52(A).

Leaving for later consideration the conflict of interest aspect as it relates to the role of the attorneys acting for Second Bank, we turn to the charge that the existence of adversary interests in the two estates alone is sufficient conflict of interest to require Second Bank's removal as personal representative in Elizabeth's estate.

Two Indiana statutes relate to this subject.

The first is Ind. Ann. Stat. § 7-406 (Burns 1953), which, in pertinent part, provides that:

"7-406. WHEN PERSONAL REPRESENTATIVE MAY BE REMOVED.—When the personal representative becomes mentally incompetent, *disqualified,* unsuitable or incapable of discharging his duties, has mismanaged the estate, failed to perform any duty imposed by law or by any lawful order of the court, or has ceased to be domiciled in the state of Indiana, the court may remove him as hereinafter provided." (Emphasis supplied.)

The second statute is Ind. Ann. Stat. § 7-415 (Burns 1953), the pertinent parts of which are:

"7-415. SPECIAL ADMINISTRATORS.—A special administrator may be appointed by the court if:

(a) From any cause delay is necessarily occasioned in granting letters, or

(b) Before the expiration of the time allowed by law for issuing letters, any competent person shall file his affidavit with the clerk that anyone is intermeddling with the estate or that there is no one having authority to take care of the same, or

(c) If any person shall have died testate and objections to the probate of his will shall have been filed as provided by law."

Indiana case law recognizes these established principles:

"A court of probate jurisdiction has great latitude and wide discretion in matters concerning the appointments and the removal of administrators * * *, and this court will not attempt to control or interfere with the Probate Courts' action therein, *except in a case where it is clear that its discretion has been abused.*" (Emphasis supplied.) *Helm* v. *Odle* (1959), 129 Ind. App. 478, 157 N. E. 2d 584. Also see: *In Re Estate of Saltzman, supra.*

The burden of proof is on the party seeking to have the personal representative removed and we must only consider the evidence most favorable to the appellee. *In Re Estate of*

*Saltzman, supra; Von Der Lieth* v. *Young* (1966), 139 Ind. App. 525, 212 N. E. 2d 404.

"It is the duty of judges exercising probate jurisdiction to evince vigorous and aggressive honesty in dealing with guardians, administrators, and other trustees, to the end that the trusts reposed in them shall be executed *with scrupulous integrity* and that complete confidence may prevail." (Emphasis supplied.) *Helm* v. *Odle, supra.*

A strikingly similar case is *In Re Estate of Cole* (1966), 240 Cal. App. 2d 324, 49 Cal. Rptr. 419, in which a bank was acting as executor of a wife's estate and her husband's estate under circumstances indicating a possible conflict of interest between the two estates. In holding that the trial court abused its discretion for removing the bank from its position as executor of the wife's estate, the California Court of Appeals said:

"*\* \* \* an adversity of interest does not, in itself, disqualify a person named in a will from serving as executor* as there is no statute authorizing disqualification on that ground (Estate of Daigh, 59 Cal. 2d 367, 368-369, 29 Cal. Rptr. 273, 379 P. 2d 761). Of course, the court has the inherent power, as indicated by appellant's authorities, to remove a personal representative who has an interest in the assets of an estate, either directly as a claimant or as a representative of a claimant, and *who performs acts with relation thereto which are inimical to the rights and interests of the heirs and creditors* [their emphasis] [citation of cases omitted]. But here the bank is a mere stakeholder *and has no actual interest in the property of either estate.* It is an officer of the court called upon to collect the assets, pay the claims and distribute to the beneficiaries." (Emphasis supplied.)

Of the two statutes cited above, none of the special conditions calling for the appointment of a special administrator exist, so Burns 7-415 is not applicable, but Burns 7-406 does apply in determining whether Second Bank is "disqualified."

In order to be "disqualified" and therefore removable, something more than the mere existence of a conflict of interest

or representation of adverse interests must be demonstrated. *In Re Estate of Saltzman, supra; Von Der Lieth* v. *Young, supra; In Re Estate of Cole, supra.* There is nothing in the record before us to indicate anything other than "scrupulous integrity" and honesty on the part of the Second Bank, nor do there exist any proven acts of mismanagement of Elizabeth's estate. Nor is it shown that Second Bank as personal representative had any personal interest or stake in the administration of Elizabeth's estate.

The record furnishes no indication that the Second Bank acted in any manner inconsistent with the interests of Elizabeth's estate. It acted only to carry out her clearly expressed intention in the Trust Agreement to transfer the Exhibit A Assets to Fred's estate, which it caused to be reopened in furtherance of Fred's intent created by Items VI and VII of his Will and as implemented by the Trust Agreement. We can find no abuse of discretion in failing to remove the Second Bank as personal representative of Elizabeth's estate.

The sole authority cited by Elizabeth's Beneficiaries to support its position that the representation by a personal representative of adversary interests in two estates is sufficient conflict of interest to require removal of a personal representative, is *In Re Estate of Collinson, etc. et al.* v. *McNutt et al., etc.* (1952), 231 Ind. 605, 108 N. E. 2d 700. An attorney in that case, acting as personal representative of an estate, allegedly gave legal advice to a person claiming to be the donee of a gift causa mortis. The court reviewed the familiar principles that an attorney is by virtue of his office disqualified from representing interests which are adverse in the sense that they are hostile, antagonistic, or in conflict with each other and that where an attorney acts for opposing parties in contested matters his conduct is open to the most careful scrutiny. *State* v. *Robbins* (1943), 221 Ind. 125, 46 N. E. 2d 691; *Bowman* v. *Bowman* (1899), 153 Ind. 498, 55 N. E. 422; *Wilson* v. *State* (1861), 16 Ind. 392; *Miedreich* v. *Rank* (1907), 40 Ind. App. 393, 82 N. E. 117; *Sun Building & Loan*

*Ass'n of Newark* v. *Rashkes* (1936), 119 N. J. Eq. 443, 183 A. 274. These principles should often be reviewed but are not applicable here.

The adverse interests here were, in fact, represented by different counsel. We need not decide, therefore, under what circumstances the court, the personal representative, and attorneys of record should act to make certain that antagonistic interests are adequately represented by independent counsel.

The trial court did not abuse its discretion by not removing either the Second Bank as personal representative, or its attorneys.

*ISSUE THREE*—It is our opinion that the appreciation in the value of the assets constituting the life estate (the Exhibit A Assets) passed to the remaindermen under Fred's Will upon the death of Elizabeth and that these assets did not become the property of the life tenant, Elizabeth.

In considering the question of whether appreciation of the value of trust assets is to be deemed part of the corpus of the trust or income, our Supreme Court, in *Luery* v. *Addington* (1948), 225 Ind. 581, 76 N. E. 2d 673, stated the general rule to be:

> "In Indiana, the rule seems to agree with the general rule as expressed in other jurisdictions, that 'unless otherwise expressed in or implied from the instrument itself, *appreciation or losses in the value of the fund belong to the principal.*' And, 'When securities are sold for an amount greater than the appraised or estimated value at the time of taking thereof the entire proceeds belong to the principal of the fund.' *Robison* v. *Elson Bank & Trust Co.* (1943), 113 Ind. App. 633, 658, 659, 48 N. E. (2d) 348; *Powell* v. *Madison Safe Dep. & Tr. Co.* (1935), 208 Ind. 432, 196 N. E. 324. We think the cases noted present abundant authority for holding that in the absence of anything to the contrary in the will creating the trusts in question, the premiums paid for the redemption of the notes—notes which at the time constituted the entire *corpus* of the trust—were properly accredited to principal and not to income" (Emphasis supplied.)

While Item VI of Fred's Will might appear to give Elizabeth uncontrolled power over appreciation in the value of the life estate assets, it must be read and construed in conjunction with Item VII. The second paragraph of Item VII directs the Second Bank as Executor, in effect, to distribute, in accordance with the terms of the Will, stocks, bonds and securities which may be in its possession as Fred's property. Any other property not in such form is to be sold and distributed in accordance with the terms of the Will, but Fred as testator clearly expressed an intention that any of his property in the possession of his wife at the time of her death, which would necessarily include any appreciation in such property, be distributed according to the terms of the Will, *i.e.*, to Fred's Beneficiaries. Thus, there is no expression, express or implied from the Will, that the appreciation in Fred's property should go anywhere other than to Fred's Beneficiaries.

The argument of Fred's Beneficiaries that the broad scope of the power given to Elizabeth with respect to the life estate resulted in "severe limitations on the remainder interests of his remaindermen" does not result in depriving Fred's Beneficiaries as remaindermen of the appreciated value of the original assets. We can find no language in Fred's Will which would indicate anything other than that his beneficiaries receive the appreciated value of "my property" at the time of Elizabeth's death.

Fred's Beneficiaries cite no authority nor any language in Fred's Will or the Trust Agreement which, in our opinion, prevents the operation of the general rule applied and followed in *Luery* v. *Addington, supra.*

*ISSUE FOUR*—It is our opinion that the trial court did not commit reversible error by holding that the appreciated life estate assets of Fred's estate (the Exhibit A Assets) should be taxable, if at all, as assets in Fred's estate.

Elizabeth's heirs hold there is no taxation issue and the court's finding that the Exhibit A Assets should be taxable, if at all, in Fred's estate should be set aside.

Paragraph 6-d of the trial court's Pre-Trial Order asks what is certainly more than a rhetorical question:

"Is the Elizabeth Anderson estate liable for any taxes related to assets, property or amounts in dispute in this cause?" (Tr. p. 159.)

The taxation issue was before the court, vague as it may have been.

Since we have previously determined that any appreciation of life estate assets (Exhibit A Assets) became part of the assets passing to the remaindermen (Fred's beneficiaries), any tax based on these assets must necessarily be borne by Fred's Beneficiaries. Consequently, the trial court correctly determined which of the two estates was liable for the tax, if any, or whatever. While the issue is not defined, we see no basis for finding reversible error. Rule TR. 61.

Elizabeth's heirs, in the alternative, postulate that even if taxation was an issue, no evidence was adduced at trial on the taxation question and therefore the trial court's judgment is not supported by any evidence. This is not true. Certain tax consequences necessarily flowed from the court's determination that the Exhibit A Assets properly became a part of Fred's estate for distribution to the remaindermen (Fred's Beneficiaries) and thereby formed a basis for the court's determination. Elizabeth's Beneficiaries had ample opportunity to present evidence on the taxation question, which apparently they did not do and therefore cannot be heard to complain. If any error there be, it has been effectively waived. *Linville* v. *Shelby County Plan Commission* (1972), 258 Ind. 467, 281 N. E. 2d 884.

The judgment is therefore affirmed.

Sullivan, J., concurs; White, J., concurs in result.

NOTE.—Reported in 286 N. E. 2d 852.