**AMOCO OIL COMPANY,**
Plaintiff-Appellee,

v.

**Glyndon R. ASHCRAFT and Carolyn S. Ashcraft, Defendants-Appellants,**

**Charles Bowlby Oil Co., Inc., Charles E. Bowlby, and Dorothy J. Bowlby, Defendants.**

No. 85–2152.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1986.

Decided May 20, 1986.

J. Lee McNeely, McNeely & Sanders, Shelbyville, Ind., defendants-appellants.

Brian K. Burke, Baker & Daniels, Indianapolis, Ind., plaintiff-appellee.

---

Before BAUER and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Amoco brought this diversity suit to collect a debt of $62,000 from the Charles Bowlby Oil Company. It joined as additional defendants the Ashcrafts, who had guaranteed Bowlby Oil Company's debts, and Mr. and Mrs. Bowlby, who had done likewise. Apparently neither the Bowlby company nor the Bowlbys have any assets, although they remain as parties defendant in the district court. The Ashcrafts counterclaimed against Amoco for fraud and breach of contract. The district judge granted Amoco's motion for summary judgment against the Ashcrafts, and entered judgment in its favor for the full $62,000 and dismissed the counterclaims. He made the judgment final and appealable under Fed.R.Civ.P. 54(b). The Ashcrafts have appealed, raising interesting questions of contract law which the parties agree are governed by the common law of Indiana.

In 1981 Bowlby Oil Company was a franchised wholesaler of Amoco products, mainly home heating oil and gasoline, in Shelby County, Indiana. The company had fallen on evil days, and owed Amoco more than $200,000, though its credit limit was only $100,000. Glyndon Ashcraft, a successful small businessman—the sole owner of a trucking firm that had $5 million in annual sales—bought Bowlby Oil Company for $150,000. A few days after the deal closed, Ashcraft and his wife signed a document entitled "Unlimited Guaranty." (The Bowlbys had signed a similar guaranty when they had received the Amoco franchise in 1975.) In it they "Unconditionally Guarantee[d] Payment When Due ... of any and all indebtedness, including interest thereon, of [Bowlby Oil Company] to [Amoco], howsoever such indebtedness may arise, whether as principal, guarantor, indorser or otherwise, now or hereafter existing ...." According to Mr. Ashcraft's affidavits and deposition, which we must treat as truthful for purposes of deciding whether summary judgment for Amoco was proper, Amoco's local manager, Warrick, had told Ashcraft that he and his wife must sign the guaranty to continue doing business with Amoco and that it was only a guaranty of debts arising out of Ashcraft's operation of the company, not of the preexisting debt of $200,000.

Under Ashcraft's management Bowlby Oil Company managed to reduce its debt to Amoco—at one point to as low as $44,000. But the improvement was temporary. Although Amoco extended fresh credit to Bowlby Oil Company, the company continued to flounder, and after only six months of operation Ashcraft abandoned it, with Bowlby Oil Company owing Amoco $62,000; this suit followed. It seems that Mr. Bowlby had misrepresented the financial health of his company when he sold it to Ashcraft, for he later agreed to return the purchase price in exchange for a release of any claims that Ashcraft might have against him for misrepresentation.

The Ashcrafts make three arguments why it was wrong for the district judge to grant summary judgment for Amoco. The first is that the guaranty is ambiguous and Ashcraft should therefore be allowed to testify to the interpretation that Warrick placed on it. Indiana adheres to the ancient, mysterious, and much-derided distinction between "patent" and "latent" ambiguities in contracts and wills. *Ohio Casualty Group of Ins. Cos. v. Gray*, 746 F.2d 381, 383 (7th Cir.1984); *Hauck v. Second Nat'l Bank*, 153 Ind.App. 245, 261–64, 286 N.E.2d 852, 862–64 (1972); see generally Goetz & Scott, *The Limits of Expanded Choice: An Analysis of the Interactions Between Express and Implied Contract Terms*, 73 Calif.L.Rev. 261, 268 n. 13 (1985); Comment, *The Problem of the "Unomitted Spouse" Under Section 2–301 of the Uniform Probate Code*, 52 U.Chi.L. Rev. 481, 502 n. 102 (1985), and references cited there. If the ambiguity is patent, oral testimony is inadmissible to eliminate it; if latent, oral testimony is admissible. One might have thought the opposite more sensible: that if the contract was clear on

its face—meaning that any ambiguity was latent—there would be no occasion to search for ambiguity, while if the contract was unclear the court would try to gather its meaning from any source it could, including oral testimony.

Some sense can be made out of the "patent-latent" distinction by noting that the concept of "patent" ambiguity is actually used in two different senses: where an ambiguity apparent on the face of the contract, which is to say apparent even to the reader who knows nothing about the background or circumstances of the contract, can be cleared up by a careful reading; and where the contract is (again on its face) so inconsistent, incoherent, or incomplete that the only reasonable inference is that the parties failed to reach agreement, in which event the contract fails for indefiniteness, and is not enforced. See *Hauck v. Second Nat'l Bank, supra,* 153 Ind.App. at 262–63, 286 N.E.2d at 862. If the contract is clear on its face but does not clearly resolve the specific contingency that has arisen, maybe because no one thought of the contingency when the contract was drafted, the court will admit evidence to show how the parties would have dealt with the contingency had they made specific provision for it.

■ So the court must first try, without taking any oral testimony, to figure out what the contract means; if it succeeds it will enforce the contract in accordance with that meaning. If the court is unable to do this, oral testimony will be admitted to disambiguate the contract unless it is apparent from the words of the "contract" that the parties had never agreed on its essential terms. See, e.g., *English Coal Co. v. Durcholz,* 422 N.E.2d 302, 308–09 (Ind.App.1981). The judge followed this procedure here and properly concluded that the language we quoted earlier made the Ashcrafts guarantors of Bowlby Oil Company's preexisting indebtedness to Amoco. The words "now or hereafter existing" admit of no other interpretation. The Ashcrafts find ambiguity in the words "howsoever such indebtedness may arise," arguing that "may arise" could mean something

in the future, and only in the future. But bearing in mind that the words that follow are "whether as principal, guarantor, indorser or otherwise, now or hereafter existing," the words "howsoever such indebtedness may arise" must mean that the signers of the guaranty are liable whether Bowlby Oil Company incurs (or incurred) the debt as a principal (i.e., borrower) or in some other capacity (such as a guarantor) and whether it is a preexisting or a future debt. For "may" can refer to modality as well as "time" (*"how*soever" seems in fact to point to modality more clearly than to time); here it refers to both; and it embraces past as well as future. There is no ambiguity—certainly none serious enough to require, or under Indiana law allow, resort to oral testimony.

■ The Ashcrafts' next argument is that Amoco is estopped to enforce the guaranty by the representation of its agent, Warrick, that the guaranty referred only to debts that Bowlby Oil Company might incur under Ashcraft's management. This argument gains no added cogency by being used as the basis for a counterclaim rather than just as a defense to Amoco's claim, or by being called fraud or misrepresentation rather than estoppel. The argument for estoppel founders on the principle of Indiana law that a misrepresentation about the meaning of a document, as distinct from a misrepresentation of fact, is not actionable. See, e.g., *Clem v. Newcastle & Danville R.R.,* 9 Ind. 488 (1857); *Skrypek v. St. Joseph Valley Bank,* 469 N.E.2d 774, 779–80 (Ind.App.1984); *Plymale v. Upright,* 419 N.E.2d 756, 763–65 (Ind.App.1981). The party to whom the misrepresentation is made can protect himself by reading the document, whereas a factual misrepresentation might concern matters to which he lacked equal access. He might not know whether the seller's house has termites but he ought to be able to find out whether the contract of sale contains the express warranties that the seller tells him it contains. It might seem that it would always be cheaper for the defendant to avoid misrepresentations than

for the plaintiff to unmask them. This may be true of deliberate misrepresentations; and in such cases—cases of fraud in a strong sense—a more liberal rule is indeed followed. See Restatement (Second) of Contracts § 166 and illustration 3 (1979). But there is no contention that Warrick was deliberately misrepresenting the meaning of the guaranty; he may honestly if foolishly have thought it limited to debts arising after it was signed.

Even in the case of deliberate misrepresentations, a requirement that the plaintiff prove reasonable reliance—the broader principle from which the rule that misrepresentations about the meaning of a document are not actionable is derived—serves a healthy purpose. Legal proceedings are costly, and it is cheaper for a potential victim of misrepresentation to take very inexpensive precautions than to allow him to shut his eyes to the obvious and then sue. Moreover, it is easy—too easy—for someone who wants to get out of an onerous obligation to testify that he was induced to shoulder it by a misrepresentation. The fact that a reasonable person would not have been induced gives grounds for doubting such testimony: grounds, indeed, for being unwilling even to listen to it.

Of course in some cases it would be unreasonable to suppose that the promisor could have protected himself by reading the document; he may have been blind, or illiterate, or mentally incompetent. But for cases of this sort the doctrines of duress and overreaching, which have coalesced in the modern doctrine of unconscionability, provide the remedy. And unconscionability is indeed the third ground on which the Ashcrafts seek to avoid their obligations under the guaranty. They do not allege any physical or mental incapacity that prevented them from appreciating the significance of the document that they signed, or claim that Amoco had fiduciary obligations to them; they appeal to a more amorphous though influential conception of unconscionability, a conception used to void obligations felt somehow to have been unfairly imposed by a strong on a weak party. "A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." Restatement, *supra,* § 208, comment d; see Farnsworth, Contracts § 4.28, at pp. 314–16 (1982).

There can be no objection to using the one-sidedness of a transaction as evidence of deception, lack of agreement, or compulsion, none of which has been shown here. The problem with unconscionability as a legal doctrine comes in making sense out of lack of "meaningful choice" in a situation where the promisor was not deceived or compelled and really did agree to the provision that he contends was unconscionable. Suppose that for reasons unrelated to any conduct by the promisee the promisor has very restricted opportunities. Maybe he is so poor that he can be induced to sell the clothes off his back for a pittance, or is such a poor credit risk that he can be made (in the absence of usury laws) to pay an extraordinarily high interest rate to borrow money that he wants desperately. Does he have a "meaningful choice" in such circumstances? If not he may actually be made worse off by a rule of nonenforcement of hard bargains; for, knowing that a contract with him will not be enforced, merchants may be unwilling to buy his clothes or lend him money. Since the law of contracts cannot compel the making of contracts on terms favorable to one party, but can only refuse to enforce contracts with unfavorable terms, it is not an institution well designed to rectify inequalities in wealth.

This may be why Indiana is so unfriendly to the defense of unconscionability. See, e.g., *Carr v. Hoosier Photo Supplies, Inc.,*

441 N.E.2d 450, 455–56 (Ind.1982); *Sink & Edwards, Inc. v. Huber, Hunt & Nicols, Inc.*, 458 N.E.2d 291, 296 (Ind.App.1984); *General Bargain Center v. American Alarm Co.*, 430 N.E.2d 407, 412 (Ind.App. 1982); *Dan Purvis Drugs, Inc. v. Aetna Life Ins. Co.*, 412 N.E.2d 129 (Ind.App. 1980); *Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1209 (7th Cir.1985). The only reported case where it was accepted also involved Amoco, *Weaver v. American Oil Co.*, 257 Ind. 458, 276 N.E.2d 144 (1971), but that is the only resemblance to this case. Weaver had quit high school after only a year and a half and had never worked other than as a laborer until he leased a gas station from Amoco. The lease contained a clause, untitled, in fine print, whereby the lessee guaranteed the lessor against the consequences of the lessor's own negligence. Amoco's representative told Weaver to sign the lease, but did not tell him to read it, and Weaver did not read it. The Indiana Supreme Court held that it was unconscionable to enforce the clause against him. Amoco was taking advantage of Weaver's ignorance and inexperience by configuring the clause in a manner calculated to make it unintelligible to the uneducated and inexperienced person with whom it was dealing. Even if he had read the lease, Weaver probably would not have understood the significance of a clause requiring that he indemnify Amoco for the consequences of the latter's negligence—would not have realized that he was being made an insurer of conduct over which he had little or no control and which could visit staggering financial burdens on him. The costs of information to Weaver were prohibitive—and known to be such by Amoco and indeed made so in part by Amoco's deliberate conduct. There is nothing like that in this case. The guaranty was not in fine print, was clearly labeled, was emphatically worded, was embodied in a separate document of which it was the central clause, and was in fact read by Ashcraft, an experienced businessman with a high-school education.

It is true of course that Ashcraft is less sophisticated than Amoco and that he is a little person and Amoco is a giant corporation, and it may be true that he had little choice in signing the guaranty because Bowlby Oil Company was over its credit limit and thus vulnerable to an immediate termination of the Amoco franchise that was its most valuable asset. The last point is obscure on the present record. In contemplation of the sale of the stock of Bowlby Oil Company to Ashcraft, Amoco made an agreement with Bowlby Oil Company to continue extending it credit, even though it was over the credit limit. The agreement contains a paragraph, signed by Ashcraft, guaranteeing Bowlby Oil Company's debt to Amoco. Whether because the language of this paragraph is less emphatic than that in the separate guaranty, or because Mrs. Ashcraft may own most of the couple's assets, or for some other reason, Amoco did not base its suit on the guaranty in the contract with Bowlby Oil Company. Given that contract, moreover, it is very difficult to understand Ashcraft's argument that he had to sign the separate guaranty in order to assure that Amoco would continue extending credit to Bowlby Oil Company. Nonetheless there is evidence in the record that Amoco did insist on the separate guaranty as a precondition of extending credit, and the conflict in the evidence cannot be cleared up on summary judgment.

To extract a concession by threatening a deliberate breach of a clear contractual undertaking can be duress. See, e.g., *Selmer Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924 (7th Cir.1983). But Ashcraft does not argue that this is what Amoco did. His argument is simply that the transaction over the separate guaranty was one-sided; that he and his wife had no choice but to sign the guaranty, since if they did not do so Amoco could (how it could is unclear, given the contract between Amoco and the Bowlby Oil Company, but we shall let this pass) terminate the franchise because of the unpaid debt. But an apparently one-sided transaction is merely a predicate for invoking the doctrine of unconscionability; it is not unconscionable per se. Indiana does not conceive it to be a proper judicial func-

524

tion to rewrite commercial contracts entered into by fully adult, fully consenting, fully competent business people.

This precept is particularly relevant in a case such as this where the party who is trying to get out of a contract on the ground that it is one-sided was responsible for its being so. No one made Ashcraft buy out the Bowlbys. No one made him close with them before finding out what additional guaranties Amoco might demand. He bought Bowlby Oil Company knowing that it was in default to Amoco, so that its franchise was in jeopardy. He could before closing have gone to Amoco and asked for an assurance of continued support without a personal guaranty and if Amoco had refused he could have walked away from the deal and gone back to his main business of operating a trucking company; his livelihood was not at stake. He did not seek to negotiate better terms. He put himself over a barrel; the courts will not pull him upright. He gambled that at the price he was paying for Bowlby Oil Company he would be able to pay off its debt to Amoco and make a profit for himself. He threw a pair of balanced dice, and lost, and that is the end of it so far as Indiana law is concerned. If the courts let him off the hook, it would just make it more difficult for people in his position to strike deals they believe are advantageous—that indeed are advantageous when made, though given the inevitable uncertainties of commercial life (of life, period) a certain percentage go awry. The less protection Amoco has, the less willing it will be to extend credit. Ashcraft counted on that credit when he bought Bowlby Oil Company. The credit was extended, and launched him on a course that he hoped would prove successful; that it was not is one of the unavoidable incidents of our nation's (relatively) free market system, from which Ashcraft in his other ventures has benefited. Indiana has resisted thus far the tug to a more paternalistic conception of the judicial role in enforcing contracts.

One of the Ashcrafts' counterclaims is for breach of the contract between Amo-

co and Bowlby Oil Company. Since the contract was with Bowlby Oil Company, only Bowlby Oil Company can sue unless the Ashcrafts are third-party beneficiaries; they do not argue that they are. The counterclaim was correctly dismissed.

AFFIRMED.